**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Edward William THOMPSON,**
**Defendant–Appellant.**

No. 94–30104.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 10, 1996.

Decided April 29, 1996.

Crandon Randell, Assistant United States Attorney, Anchorage, Alaska, for plaintiff-appellee.

Kevin F. McCoy, Assistant Federal Public Defender, Anchorage, Alaska, for defendant-appellant.

Before: BROWNING, WRIGHT and CANBY, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

Thompson shot a man who had come to his apartment as part of a scheme to buy drugs. He was convicted of several drug- and weapons-related crimes in connection with the shooting. Among other issues, we must determine the effect of *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), on his conviction under 18 U.S.C. § 924(c)(1).

## BACKGROUND

At about 5:00 a.m. on July 21, 1992, four men arrived at Thompson's apartment. One, Hollen, went inside and bought a half-gram of cocaine from Thompson. Meanwhile his companions, Pitcher, Perez and Wilson, waited outside. As Hollen was leaving, the other men pushed through the door. The evidence is conflicting as to what happened next. Pitcher said they were attempting to collect, by force, $100 that Thompson owed Wilson. Thompson told police the men threatened to murder him. Thompson's girlfriend, Wendy Carpenter, testified that Pitcher threw her down and threatened to rape her.

The men scuffled, and Thompson and Wilson ended up in the bedroom out of sight of witnesses. Thompson shot and killed Wilson. Pitcher testified that the shots sounded muffled. Hollen and Pitcher fled as Carpenter called 911.

When police arrived, they questioned Thompson and Carpenter but did not arrest them. Thompson immediately showed police the gun he had used, a 9–millimeter Cobray pistol. No silencer was attached. Thompson answered some police questions, but refused to answer others, saying he was scared and wanted to talk to a lawyer.

The police later legally searched the apartment and found a "fake suppressor" in a gun case in the closet. A fake suppressor is a barrel extender that is meant to look like a silencer but does not actually muffle sound. Expert inspection, however, revealed that this fake suppressor had been modified to act as an effective silencer. The police also found another pistol, marijuana, scales with traces of cocaine and other drug-related paraphernalia.

Thompson was convicted of possession of an unregistered silencer (18–month sentence); possession with intent to distribute marijuana and cocaine (18 months for each count); use of a firearm during a drug trafficking crime (5–year mandatory sentence); and use of a firearm equipped with a silencer during a drug trafficking crime (30–year mandatory sentence).[1]

## DISCUSSION

### I. *Jury Instructions*

■ Thompson complains of several instructional errors. We review de novo whether a jury instruction misstates the elements of a crime. *United States v. Vaandering,* 50 F.3d 696, 702 (9th Cir.1995).

### A. *Use of a Firearm Equipped with a Silencer*

■ Thompson was convicted of two counts of violating 18 U.S.C. § 924(c)(1), one for using the Cobray pistol during and in relation to a drug trafficking crime, and one for using a firearm equipped with a silencer during and in relation to a drug trafficking crime. He argues that the instructions improperly allowed the jury to find him guilty

---

1. The state did not charge Thompson with homicide or any other crime related to Wilson's death.

of the latter crime without finding that he actively employed a firearm equipped with a silencer. We agree.

The conviction was predicated on these facts. When the police arrived at Thompson's apartment after the shooting, he immediately pointed out that the pistol he had fired was on the table near the door. The silencer was nowhere in sight. Police later discovered it, in a locked gun case, in the hall closet. A forensics expert tested the silencer but could not determine whether it was affixed to the pistol when Thompson fired it. One witness testified that the shots had sounded muffled. The government argued in closing that it didn't matter whether Thompson actually used the silencer.

The court instructed the jury that the silencer was a "firearm" for the purposes of section 924(c)(1). Then it instructed that:

> [t]he defendant is considered to have used a firearm if its presence in his possession in any manner facilitated the carrying out of the drug trafficking crime. A firearm may facilitate or have a role in a drug trafficking crime by emboldening the defendant who had an opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or discharge in fact occurs....

Following this instruction, the jury could have found that Thompson "used" the silencer even if it never left the closet.

The Supreme Court recently disapproved this result in *Bailey v. United States*, — U.S. —, —, 116 S.Ct. 501, 505, 133 L.Ed.2d 472 (1995). It held that "§ 924(c)(1) requires evidence sufficient to show an *active employment* of the firearm by the defendant,

a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* (emphasis in original). The Court specifically rejected the notion that mere emboldening or protection constitutes use. Thompson's conviction cannot stand.[2]

■ At oral argument the government advanced the contention that, even after *Bailey*, the silencer need not have been affixed to the pistol at the time of the shooting in order for the firearm to be "*equipped with*" a silencer.[3] The government concludes that having the silencer readily available was sufficient for conviction, so that no harm resulted from the misdefinition of "use" in the instructions.

The government cites *United States v. Rodriguez*, 841 F.Supp. 79 (E.D.N.Y.1994), *aff'd*, 53 F.3d 545 (2d Cir.), *cert. denied*, — U.S. —, 116 S.Ct. 243, 133 L.Ed.2d 170 (1995), a pre-*Bailey* case, to support its argument. In *Rodriguez*, the court ruled that a firearm is "equipped with" a silencer if the silencer is "readily available for joint use"; actual attachment is not required. *Id.* at 83. Thus, the court held, storage of pistols with compatible silencers near a cache of drugs constituted use of a firearm equipped with a silencer during or in relation to a drug trafficking crime.

■ *Rodriguez* relied in large part on the parity between its definition of "equipped" and the then-prevailing definition of "use." *Id.* at 84–85 ("equipped" should be construed consistently with "use").[4] We do likewise, because we must "consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme. 'The meaning of statutory lan-

---

2. Thompson has not asked us to reverse under *Bailey* his conviction for use of the Cobray pistol during and in relation to the drug trafficking crime, and we therefore will not review it. We note that there is no question that by shooting Wilson he "actively employed" the pistol.

3. The jury instructions entirely omitted the phrase "equipped with." Thus, even if the government were correct in its definition of that phrase, we would reverse. We nonetheless address the issue because it will recur on remand.

4. The court noted that "use," as it was understood before *Bailey*, extended to circumstances in which the firearm was not active use but was "quickly and easily available for use" during a drug transaction. *Id.* at 84 (quotation omitted). It also remarked, "Had Congress, in enacting § 924(c)(1), intended by the word 'use' to proscribe only the actual firing or brandishing of a firearm, defendant's contention that one could not, therefore, use a firearm 'equipped' with a silencer unless the silencer was actually attached to the gun brandished or fired might have some appeal." *Id.* at 85.

guage, plain or not, depends on context.'" *Bailey*, —— U.S. at ——, 116 S.Ct. at 506 (quoting *Brown v. Gardner*, —— U.S. ——, ——, 115 S.Ct. 552, 555, 130 L.Ed.2d 462 (1994)).

*Bailey* defines "use" to mean "operative factor." The broad definition of "equipped with" that the government urges would be inconsistent with the narrower congressional intent the *Bailey* court discerned: Congress could not have intended to impose a five-year penalty *only* if a drug trafficker actively employed a firearm, but mandate a 30–year sentence if that same defendant happened to own a compatible silencer that played no role in the predicate crime.

Nor can such a broad definition be squared with the statutory requirement that the firearm be equipped with a silencer "during and in relation to" a predicate crime. A pistol may be equipped with a silencer in a general sense because its owner also possesses a compatible silencer. But that person is not using a firearm equipped with a silencer "during and in relation to" a drug trafficking crime if at the time of the crime, the silencer is locked away in a closet.

We hold that, at a minimum, the silencer must have played some role in the predicate drug trafficking crime in order for Thompson to be subjected to the 30–year penalty for using a firearm equipped with a silencer. Under the facts as they were presented in this case, only actual attachment would satisfy this requirement.[5]

## B. *Knowledge that the Suppressor Was a Silencer*

■ Thompson contends that we should reverse his conviction for possessing an unregistered silencer in violation of the National Firearms Act, 26 U.S.C. § 5861(d), because the jury instructions misstated the mens rea requirement. He argues that the

government should have been required to prove that he knew that the fake suppressor had been altered to act as a silencer.[6]

The National Firearms Act prohibits possession of certain types of firearms unless those weapons have been registered in the national firearms registration record. 26 U.S.C. § 5841, 5861(d). All silencers fall within the purview of the Act. 26 U.S.C. § 5845. In *Staples v. United States*, —— U.S. ——, ——, 114 S.Ct. 1793, 1804, 128 L.Ed.2d 608 (1994), decided nine months after trial, the Court held that the mens rea for possession of an unregistered firearm is knowledge of "the features of [the firearm] that brought it within the scope of the Act." We must determine whether the jury instructions adequately conveyed the mens rea *Staples* prescribes, i.e., that Thompson knew the fake suppressor had been modified to act as a silencer.

The jury was instructed that to find Thompson guilty of possession of an unregistered firearm, it must find that "the defendant knowingly possessed a silencer" that was not registered to him in the national firearms registration record. The court defined "knowingly" to mean that "the defendant realized what he was doing and did not act through mistake, accident, or other innocent reason."

There are two ways to read this instruction: "knowingly" could modify only "possessed," meaning that Thompson knew he possessed an object that happened to be a silencer. Alternatively, "knowingly" could modify the entire phrase, meaning that Thompson knew the object he possessed was a silencer. *See Staples*, —— U.S. at ——, 114 S.Ct. at 1805 (Ginsburg, J., concurring) (discussing the various "level[s] of knowledge" that the term "knowingly possessed" might imply).

---

**5.** We leave open the question whether there are any circumstances short of actual attachment that might satisfy the requirement that a firearm be "equipped with" a silencer. We express no opinion whether, for example, a drug trafficker who transacts business with a pistol and a compatible but detached silencer on display is using a firearm equipped with a firearm silencer. *Cf. Bailey*, —— U.S. at ——, 116 S.Ct. at 508 ("silent

but obvious and forceful presence of a gun on a table can be a 'use'").

**6.** Thompson argues that the jury instructions for his conviction for use of a firearm equipped with a silencer, 18 U.S.C. § 924(c)(1), were similarly flawed. We need not reach this issue because we reverse that conviction under *Bailey*.

In this context, the more natural reading of the instruction is that Thompson had to know that what he possessed was a silencer. *See Staples,* —— U.S. at ——, 114 S.Ct. at 1806 (Ginsburg, J., concurring) (noting that "knowingly possessed a machine gun" properly describes the mens rea requirement for section 5861). Because all silencers must be registered, the term "silencer" encompasses the characteristics that brought the firearm "within the scope of the Act." *Staples,* —— U.S. at ——, 114 S.Ct. at 1804. There was no error.

## II. *Sufficiency of the Evidence of Knowledge of the Characteristics of the Silencer*

■ Thompson also contends that his conviction for possession of an unregistered silencer must be reversed because there was insufficient evidence that he knew the fake suppressor was a "firearm" within the meaning of the Act.

■ In reviewing a challenge to the sufficiency of the evidence, we must affirm if, after viewing the evidence in the light most favorable to the government, we find that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

The silencer had originally been manufactured as a fake suppressor or dummy silencer. Its purpose in its original state was to extend the barrel of the gun, and to intimidate others by giving the appearance of a silencer. Thompson bought the suppressor used; it had two prior owners.

The government's expert testified that upon holding the cylinder up to the light, "anybody could notice" that someone had drilled holes in it. These holes, another expert testified, "dissipate[ed] the energy of

the muzzle blast," transforming the fake suppressor into a silencer. The silencer was a "good fit" for the pistol and performed effectively when tested. The government pointed out that a silencer would have been a useful tool for a drug dealer doing business in a populated area. And there was testimony that Thompson may have used the suppressor during the shooting.

■ This evidence does not prove directly that Thompson knew his fake suppressor was a silencer, but "knowledge can be inferred from circumstantial evidence, including any external indications signaling the nature of the weapon." *Staples,* —— U.S. at —— n. 11, 114 S.Ct. at 1802 n. 11. We find that a rational trier of fact could have inferred Thompson's knowledge from the evidence presented.

## III. *Pre–Arrest Silence*

■ When police arrived at Thompson's apartment after the shooting, they questioned him at length. He answered most questions, but refused to answer a few. During direct examination, the detective who interviewed Thompson testified that in response to three questions, Thompson told him he was "scared and wanted to talk to a lawyer." The detective also testified that he was "kind of at a loss at that response" because "[f]rom my observations at the apartment, I assumed that he had possibly shot somebody that broke into his apartment, and normally under those circumstances, people I talk with are more than eager to tell me what happened." The prosecutor highlighted this testimony, making it the final note of his closing argument.[7]

■ ▪Thompson argues that admission of this testimony violated his Fifth Amendment privilege against self-incrimination. Because he did not properly object to this line of

7. The last words of the prosecutor's closing argument were:

> I am not going to make a big deal out of Mr. Thompson's response when the police come [sic] to the door following this shooting. I'm not going to make a big deal about it at all. But you got to admit, it's a little strange under the circumstance, have the police come in there, and the first thing they're going to say is,

> "What happened?" "I want a lawyer." I mean, that's strange. That's not the way people in circumstances that are legitimate are going to react. They would probably be inclined to tell the cop what happened; "This guy broke into my apartment." None of that happened. But then again, this is Mr. Thompson.

questioning, we review for plain error. Fed. R.Crim.P. 52(b). In *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993), the Court held that one of the "limitation[s] on appellate authority under Rule 52(b) is that the error be 'plain.' 'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" The Court clarified this test: "At a minimum, the Court of Appeals *cannot* correct an error pursuant to Rule 52(b) unless the error is clear under current law." *Id.* (emphasis added).

The Second Circuit has recently remarked, "we do not see how an error can be plain error when the Supreme Court and this court have not spoken on the subject, and the authority in other circuits is split." *United States v. Alli–Balogun,* 72 F.3d 9, 12 (2d Cir.1995). That commonsense conclusion is equally applicable here. We must consider whether the available authorities provide a clear answer to the question before us.

There is no controlling Supreme Court precedent. The most closely analogous cases lead to conflicting conclusions. In *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Court held that the Fifth Amendment forbids both comment by the prosecution on the accused's failure to testify at trial and the use of that silence as evidence of guilt. But *Griffin* does not necessarily apply in a pre-arrest, non-coercive situation. In *Jenkins v. Anderson,* 447 U.S. 231, 238, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980), the Court ruled that a prosecutor may use a defendant's pre-arrest silence to impeach him. The Court grounded its decision on the defendant's tactical decision to testify: once he has waived his right to remain silent, "the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination." *Id.* (quotation omitted). Because Thompson did not waive his privilege by testifying, *Jenkins* provides no guidance here.

8. In *United States v. Caro,* 637 F.2d 869, 876 (2d Cir.1981), the court assumed without deciding that pre-arrest silence could not be used in the prosecution's case in chief, and then found the assumed error to be harmless.

Our court has not addressed the issue of use of pre-arrest, pre-*Miranda* silence as substantive evidence of guilt. *See United States v. Calise,* 996 F.2d 1019, 1022 (9th Cir.1993) (not reaching the issue because court gave curative instruction telling jury not to infer guilt from pre-arrest silence), *cert. denied,* —— U.S. ——, 114 S.Ct. 895, 127 L.Ed.2d 88 (1994).

Other circuits are split. The First, Seventh and Tenth Circuits have held that pre-arrest silence comes within the purview of *Griffin*'s proscription of comment on a defendant's privilege against self-incrimination. *See United States v. Burson,* 952 F.2d 1196, 1200–01 (10th Cir.1991), *cert. denied,* 503 U.S. 997, 112 S.Ct. 1702, 118 L.Ed.2d 411 (1992); *Coppola v. Powell,* 878 F.2d 1562, 1567–68 (1st Cir.), *cert. denied,* 493 U.S. 969, 110 S.Ct. 418, 107 L.Ed.2d 383 (1989); *United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1018 (7th Cir.1987).[8] The Seventh Circuit subsequently held, however, that comment is permitted when, as with Thompson, the defendants selectively respond to an investigator's questions. *United States v. Davenport,* 929 F.2d 1169, 1174–75 (7th Cir.1991) (once defendants in a voluntary, non-custodial interview gave an officer their version of events, they "forfeited their privilege not to answer questions concerning that version"), *cert. denied,* 502 U.S. 1031, 112 S.Ct. 871, 116 L.Ed.2d 776 (1992).

The Eleventh Circuit has ruled that under *Jenkins,* comment on pre-arrest silence is permissible. *United States v. Rivera,* 944 F.2d 1563, 1568 (11th Cir.1991). Most recently, the Fifth Circuit held that, where the defendant's silence is "neither induced by nor a response to any action by a governmental agent," the Fifth Amendment is inapplicable. *United States v. Zanabria,* 74 F.3d 590, 593 (5th Cir.1996) ("The fifth amendment protects against compelled self-incrimination but does not ... preclude ... prosecutorial comment about *every* communication or *lack* thereof by the defendant which may give rise to an incriminating inference.").[9]

9. The Fifth Circuit's concern about the lack of compulsion in the pre-arrest situation echoes Justice Stevens' concurrence in *Jenkins,* in which he said, "[w]hen a citizen is under no official compulsion whatever, either to speak or to re-

Under *Olano* we *"cannot"* correct an error unless it is clear under current law. 507 U.S. at 734, 113 S.Ct. at 1777. Because of the circuit split,[10] the lack of controlling authority, and the fact that there is at least some room for doubt about the outcome of this issue, we cannot brand the court's failure to exclude the evidence "plain error." We do not intend by this result to express any opinion about the constitutionality of the prosecutor's actions.

## IV. Rebuttal Testimony

■ Before a grand jury, Carpenter, Thompson's girlfriend, testified that she had seen guns and cocaine in Thompson's apartment before the shooting. At trial, she denied seeing guns or drugs there. She explained that she lied to the grand jury because Keller, the police officer investigating the crime, showed her photographs of women and a list of women's names and told her Thompson had had affairs with these women. This accusation made her "want to hurt [Thompson] back."

Keller testified as a rebuttal witness. He explained that he had told the 17–year–old Carpenter about Thompson's affairs because he wanted to see her go back home and wanted to break up their relationship. Thompson argues that this rebuttal evidence was more prejudicial than probative and should have been excluded under Fed. R.Evid. 402, 403 and 404(b).

This evidence was not probative of any element of the government's case: the detective's desire to remove a young woman from what he perceived to be a bad situation is irrelevant.

■ The error did not, however, affect any count of conviction. Keller's testimony only corroborated what the jury had already heard from Carpenter. And Thompson fails to demonstrate that the verdict on any count was affected by Keller's estimation of Thompson's character.

Although we find the error to be harmless, the court on remand should exclude the testimony unless the government is able to make some showing that it is relevant and does not offend Rule 403.

## CONCLUSION

We reverse and remand for retrial Thompson's conviction under 18 U.S.C. § 924(c)(1) for use of a firearm equipped with a silencer. We affirm his convictions for possession of an unregistered firearm, for possession of marijuana and cocaine with intent to distribute, and for use of a firearm in connection with a drug trafficking crime.

**AFFIRMED in part; REVERSED in part and REMANDED.**

main silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment." 447 U.S. at 243–44, 100 S.Ct. at 2132.

10. Although the Fifth Circuit decision came out after the trial, the fact that the court came to a different conclusion lends credence to the argument that the answer to this question is not "obvious."