**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 28 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

vs.

EDWARD M. SANDERS,

      Defendant - Appellant.

No. 99-3399

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 99-CR-20018)

---

Nancy Landis Caplinger, Assistant United States Attorney (Jackie N. Williams, United States Attorney, on the briefs), Topeka, Kansas, for Plaintiff - Appellee.

Gary D. Stone, Kansas City, Kansas, for Defendant - Appellant.

---

Before **KELLY**, **HOLLOWAY**, and **HENRY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

      Defendant-Appellant Edward M. Sanders appeals from his conviction by a jury of possessing a silencer not registered in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5861(d). He was sentenced to a term of fifty-

one months and three years supervised release. [1] On appeal, his sole contention is that the evidence was insufficient. Our jurisdiction arises under 28 U.S.C. § 1291 and we reverse.

## Background

On May 2, 1998, a Kansas City, Kansas police officer attempted to stop Mr. Sanders' vehicle for speeding. Mr. Sanders refused to stop. The officer pursued Mr. Sanders, who eventually abandoned his car and fled on foot. Shortly thereafter, Mr. Sanders was apprehended and arrested. The officer searched Mr. Sander's vehicle and found a Ruger MKII .22 caliber pistol under the driver's seat. Attached to the pistol's barrel was a cylindrical device that the government ultimately concluded was a silencer. On August 31, 1999, Mr. Sanders was charged by information with violating 26 U.S.C. § 5861(d). [2]

---

[1] After oral argument, the panel granted bail pending appeal, with the district court to set conditions of release. See United States v. Mitcheltree, 940 F.2d 1329, 1333 n.4 (10th Cir. 1991); United States v. Daily, 921 F.2d 994, 998 n.2 (10th Cir. 1991).

[2] The information read:

On or about May 2, 1998, in the District of Kansas, EDWARD M. SANDERS did unlawfully and knowingly receive and possess a firearm, that is, a silencer attached to a Ruger Model MKII .22 pistol, serial number 214-33315, which was not registered to him in the National Firearms Registration and Transfer Record, in violation of Title 26, United States Code, Section 5861(d).

26 U.S.C. § 5861(d) makes it unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record . . . ." A silencer is, for purposes of § 5861(d), a firearm. Id. § 5845(a)(7). A silencer is defined as "any device for silencing, muffling, or diminishing the report of a portable firearm . . . ." 18 U.S.C. § 921(a)(24). Mr. Sanders admitted that he knowingly possessed the pistol and that it was not registered to him in the National Firearms and Transfer Record. Mr. Sanders testified, however, that he did not know the attachment was a silencer.

## Discussion

We review Mr. Sander's sufficiency of the evidence claim de novo. United States v. Vallo, __ F.3d __, 2001 WL 55521, at *3 (10th Cir. Jan. 23, 2001). We view the evidence in the light most favorable to the government, Jackson v. Virginia, 443 U.S. 307, 319 (1979), and do not weigh conflicting evidence or consider the credibility of the witnesses. Vallo, __ F.3d __, 2001 WL 55521, at *3. We consider both direct and circumstantial evidence and reasonable inferences that can be drawn therefrom. United States v. Davis, 1 F.3d 1014, 1017 (10th Cir. 1993). Under that standard, the record contains no evidence that Mr. Sanders knew the "weapon he possessed had the characteristics that brought

---

Aplt. App. at 1.

- 3 -

it within the statutory definition" of a silencer, as required by <u>Staples v. United States</u>, 511 U.S. 600, 602 (1994). Thus, no rational trier of fact could have found Mr. Sanders guilty beyond a reasonable doubt. <u>See</u> <u>Vallo</u>, __ F.3d __, 2001 WL 55521, at *3.

The record evidence discloses the following. Mr. Sanders testified that he purchased the pistol from his cousin a week and a half before his arrest. Aplt. App. at 104-05. The government's firearms expert, a Bureau of Alcohol, Tobacco and Firearms ("BATF") firearms enforcement officer, testified that the rear sight had been removed from the pistol. <u>Id.</u> at 75. Below the trigger lock, a laser sighting device had been installed and a cylindrical device was attached to the barrel. <u>Id.</u> The attachment was wrapped in black tape, and possessed the features of a silencer. <u>Id.</u> at 77, 82, 90. The front of the attachment was threaded so as to attach to the front of the barrel, also threaded. <u>Id.</u> at 75-76. The attachment also had a "series of metal shaving compressed rings that were mounted . . . ." <u>Id.</u> at 77. On the back of the attachment was a rubber O-ring, which provided an air-tight seal when the attachment was fastened to the barrel. <u>Id.</u> at 75-76. The government's expert also testified that three-quarters of the interior of the barrel was hollow and a series of holes had been drilled into the barrel. <u>Id.</u> at 76-77.

According to the government's expert, it was impossible to tell that the

- 4 -

attachment functioned as a silencer without removing it from the barrel.    Id. at 87.  He further testified that, from the exterior, the attachment looked like a "bull barrel" depicted in a magazine owned by Mr. Sanders.    Id. at 85, 105.  According to the expert, a "bull barrel" is a "heavy weight barrel commonly associated with pistols intended for target use.  Whereas, a normal firearm barrel may have a taper to it to keep weight down, the bull barrel will be a solid metal barrel that would be of even diameter from the receiver to the muzzle."    Id. at 83-84.  The expert's testimony is that from the exterior, it was impossible to tell whether a bull barrel functioned like a silencer.    Id. at 86, 90.

Mr. Sanders testified that he did not believe the attachment was a silencer, id. at 104; rather, he believed the attachment to be a bull barrel.    Id. at 111.  He testified that he purchased the gun because it looked like the bull-barreled pistol he saw in his magazine and "it was a nice looking gun."    Id. at 105;  accord id. at 115.  Although he was aware that bull barrels are used in target practice, he testified that he did not buy the pistol for this purpose.    Id. at 115.  During the brief span he owned the pistol, Mr. Sanders testified that he did not remove the attachment from the barrel.    Id. at 105, 110.

The government's expert testified that the report of the pistol, when fired with the attachment, could be described as sounding like a firecracker.    Id. at 83.  The expert test-fired the pistol with and without the attachment and testified that

the attachment reduced the report of the pistol by 14.6 decibels.     Id. at 81.   He also testified that "in a reduction of that nature, you will hear a difference even though we wear sound protection."     Id.   According to the expert, there is no audible difference between the report of a regular-barreled Ruger and a bull-barreled Ruger.     Id. at 92.

Mr. Sanders testified that he shot the pistol before his arrest, and that he did not believe the attachment was a silencer because "it made a sound."     Id. at 104, 111, 113.   He described the sound "[l]ike a firecracker, like pow, pow, pow . . . ."   Id. at 104.   "It sounded just like any other .22, like a firecracker."     Id. at 113.   Mr. Sanders had heard a .22 firearm fired "plenty of times, on New Year's and, you know, whenever somebody's outside and shooting.   I live in a housing project and you hear gunshots all the time."     Id. at 114.   He has also heard his friend shoot a .22 rifle.     Id.   He believed that a .22 rifle and .22 pistol "sound almost identical."   [3]   Id.

On cross examination, the government elicited testimony about Mr. Sanders previous ownership of a Smith & Wesson 9 millimeter, a Glock 21, a Ruger 9 millimeter, and a Smith & Wesson .357.     Id. at 106.   Mr. Sanders testified that he had fired those pistols "on New Year's and stuff like that,"     id.,

_____

[3] The government attempted to rebut Mr. Sanders' testimony through its case agent. Id. at 116-18.   The case agent testified that "the sound in the pistol is much louder due to the barrel length." Id. at 117.

but had never taken those firearms apart. Id. at 110. The government also elicited testimony about why Mr. Sanders fled from the officer on the night of his arrest. According to Mr. Sanders, he fled because he had been previously been stopped and arrested several times for weapons possession in a vehicle. Id. at 107-109.

As a preliminary matter, we agree with the government that the Court in Staples did not limit "circumstantial evidence of knowledge to the external indications of the weapon." Aplee. Br. at 13. Circumstantial evidence includes, but is not limited to, "external indications signaling the nature of the weapon." Staples, 511 U.S. at 616 n.11. It should be noted, however, that Staples does not support the government's overly broad contention that knowledge of the regulated characteristics of the weapon are automatically imputed to a defendant if the defendant fired it. Aplee. Br. at 13 While the Court's observation regarding automatic weapons in Staples –that "firing a fully automatic weapon would make the regulated characteristics of the weapon immediately apparent to its owner," Staples, 511 U.S. at 616 n.11—was no doubt correct, the same cannot always be said for a person who fires a pistol with a silencer attached.

In support of the jury's verdict, the government first points to the plethora of evidence which indicated that the attachment functioned as a silencer. Aplee Br. at 11-12. However, the government's expert testified that it was impossible

to know that the attachment was a silencer based upon its physical characteristics without removing the attachment from the barrel. Aplt. App. at 87. The government presented no evidence that Mr. Sanders removed the attachment from the barrel; thus, the internal features of the attachment, standing alone, provide no basis upon which a jury could reasonably infer that Mr. Sanders knew the attachment was a silencer.

The government also argues that Mr. Sanders' knowledge could have been inferred by the jury because Mr. Sanders admitted firing the pistol and the attachment reduced the report of the pistol by 14.6 decibels. However, the expert concluded that the attachment reduced the report of the pistol only after having fired the pistol with and without the attachment. There was no testimony comparing the sound of this pistol with the attachment to the sound of a similar pistol without the attachment.

Mr. Sanders admitted to having fired the pistol with the attachment. However, there was no evidence adduced that he fired the pistol without the attachment and there was no evidence to so infer. Nor is there any evidence that Mr. Sanders previously owned a .22 caliber pistol, or had any specialized training or experience with .22 caliber pistols. On this record, no rational trier of fact could infer that Mr. Sanders knew that the report of his pistol was audibly lower than that of a .22 without a silencer.

Mr. Sanders' prior ownership of four firearms, all of which were of a different caliber than the pistol in question, simply does not constitute circumstantial evidence sufficient for a jury to infer Mr. Sanders' knowledge regarding the characteristics of the attachment. It is true that Mr. Sanders testified that he shot firearms within the city limits, but no evidence suggests that Mr. Sanders purchased the pistol because the attachment would have enabled him to fire the pistol within the city limits undetected. In sum, the jury's conclusion did not "flow[] from logical and probabilistic reasoning." United States v. Jones, 44 F.3d 860, 865 (10th Cir. 1995) (citation omitted). To sustain such a conviction would require "piling inference on inference." Id. (internal quotations and citations omitted).

Contrary to the government's contention, and assuming some persuasive value, neither United States v. Thompson, 82 F.3d 849 (9th Cir. 1996), nor United States v. Syverson, 90 F.3d 227 (7th Cir. 1996), require a contrary conclusion. Thompson is factually distinguishable because external characteristics suggested that the attachment in question was in fact a silencer. 82 F.3d at 854 ("The government's expert testified that upon holding the cylinder up to the light, 'anybody could notice' that someone had drilled holes in it."). Syverson is readily distinguishable because the defendant designed and manufactured the attachment in question. 90 F.3d at 232. In Syverson, the

government presented evidence that, contrary to the defendant's testimony, the attachment was not designed to function as a muzzle break, but instead as a silencer.  Id.  The attachment did not have slots and therefore "would not have done much, if anything, to reduce the recoil of a firearm."   Id.  Moreover, the attachment reduced the report of the pistol.  Because the defendant designed and manufactured the attachment, this evidence regarding the attachment's characteristics and function was "enough to allow a reasonable jury to infer that [the defendant's] description of the cylinder was not credible and that it was made to be a silencer, even if it was not particularly well made."   Id. at 232-33.

The government also argues that the jury did not find Mr. Sanders' testimony credible, particularly his testimony that he did not believe the attachment was a silencer because it made a sound.   [4]  Aplee. Br. at 13-14.  Were

---

[4]  In support of this argument, the government asserts that Mr. Sanders

> claimed that he thought the attachment to the gun was [a] bull barrel and that he wanted a bull barrel gun because it adds weight so "you can shoot your targets better, or something like that."  This testimony, however, conflicted with the defendant's testimony that he never used this weapons for target practice.

Aplee. Br. at 14.  This is not an accurate depiction of the record.  Mr. Sanders did not testify that he wanted the pistol for target shooting.  Rather, Mr. Sanders testified that in his book, "it says [the bull barrel] just adds weight so you can shoot your targets better or something like that."  Aplt. App. at 115 (emphasis added).  In fact, Mr. Sanders' testimony that he never used the pistol for target shooting is entirely consistent with his testimony that he did not buy the pistol for this purpose.  Id. ("Q.  So you weren't buying this for target shooting?  A.  No.").

we to assume that the jury rejected Mr. Sanders' testimony in its entirety, we would be left with the evidence in the government's case-in-chief and on rebuttal. However, that evidence simply does not establish beyond a reasonable doubt that Mr. Sanders knew the attachment was a silencer.

Implicit in the government's argument is the proposition that disbelief of Mr. Sanders' testimony provides a sufficient basis for inferring guilty knowledge. We have considered this argument before in cases where the element of knowledge was disputed and the government came up short in its proof. In Stallings v. Tansy, 28 F.3d 1018, 1024 (10th Cir. 1994), without resolving this argument, we observed that in certain limited instances a jury's disbelief of a defendant's testimony can raise a positive inference of guilt. It was unnecessary to decide under what instances disbelief of a defendant's testimony creates an inference of guilty knowledge because, under any approach discussed, the evidence was insufficient. Id. at 1024. Thereafter, in United States v. Mills, 29 F.3d 545, 550 (10th Cir. 1994), we were somewhat more categorical and stated that "[e]ven if the jury disbelieved the entire defense testimony, that disbelief cannot constitute evidence of the crimes charged and somehow substitute for knowing constructive possession in this joint occupancy situation." We followed Mills in United States v. Reece, 86 F.3d 994, 996 (10th Cir. 1996), after observing that "[a] conviction cannot be affirmed under § 841(a)(1) based only

upon evidence that tends to show a defendant was negligent or otherwise should have known about a criminal venture." Those observations apply here–mere disbelief of the defendant's testimony is insufficient to carry the government's burden as to knowledge. The evidence being insufficient, the judgment is

REVERSED.