CRAWFORD, Chief Judge
(dissenting):
I dissent because: (1) trial defense counsel made no specific objection; (2) there was no Fifth Amendment, U.S. Const, amend. V, violation; (3) there was no Article 31, Uniform Code of Military Justice (UCMJ), 10 USC § 831, violation; and (4) the evidence of appellant’s intent to kill is overwhelming, making any error harmless beyond a reasonable doubt.
FACTS
On May 19, 1998, appellant attempted to kill his wife, Marla Alameda. His acts are corroborated not only by several items of physical evidence, but also by the testimony of numerous witnesses. From 1991 until the date of the attempted murder, appellant abused his wife both physically and mentally. Appellant was a jealous, suspicious, and controlling individual. The physical and mental abuse was such that Mrs. Alameda had previously been medically evacuated from Japan to the United States.
On April 30, 1998, while his wife was asleep, appellant scrutinized his wife’s chat room messages that she had saved on her computer. He found a message that implied that a person she chatted with would soon be visiting Japan where they lived. Appellant woke her up and confronted her. He demanded she explain what happened, and became so enraged that he threw the computer off the desk, ripped the phone off the wall, and then assaulted her, leaving her bruised, shaken, and seared. He told her, “If you screw me, you better put me in jail or I will kill you.” Appellant eventually left for work.
Based on moral and physical support from her friends, she reported this assault to appellant’s commander. As a result, appellant was ordered out of their on-base quarters and put in a dormitory room. Further, he was given a direct order, both verbally and in writing, not to have any contact with his wife and son. An early return of dependents (ERD) package was initiated. Despite appellant’s refusal to sign the required papers, the command processed the action.
On May 19, Mrs. Alameda called appellant’s squadron to obtain money for groceries and was told that someone would deliver the money that day. When informed that his wife needed money, appellant refused to give her any cash. He said, “I will go buy her the groceries and I will deliver them to the house myself.” Because of the no contact order, two escorts accompanied him when he delivered the groceries to the house. He then inspected each room. Finding condoms in the bedroom, he became very upset. Appellant left the house with the escorts and then told his squadron that he was going to speak with the chaplain.
When his wife returned home from work, she noticed the groceries had been delivered and that various personal items were moved. She was upset and called the unit commander, First Lieutenant (lLt) Deborah Haussler, who calmed her down and reminded her that the ERD package would be expedited. lLt Haussler asked her to come to the unit to sign the ERD paperwork at 3:30 p.m.
Five or ten minutes later, Mrs. Alameda heard the doorbell ring and opened the door. It was appellant. She stood there frozen in terror and panic. Appellant pushed his way into the house and began yelling and screaming. He wrestled her from room to room and tried to suffocate her, first with his hands and then by using a Hefty garbage bag. Before he was able to put the garbage bag over her head, she was able to escape to the bedroom and lock the door. She climbed out of a window, went to a neighbor’s house, and called for help. This led to the charge of attempted premeditated murder.
During the opening statement, trial defense counsel admitted that the fight on April 30 occurred, but denied appellant had anything to do with the assault on May 19. In support of this contention, he argued that *204 appellant visited the chaplain’s office between 2:00 p.m. and 3:30 p.m. on May 19. The reason appellant visited the chaplain was because he had found condoms in the bedroom of his home when he delivered the groceries. Appellant also called a friend from the chapel, at 2:09 p.m., during the course of his counseling session. After visiting the chaplain, appellant went back to the barracks, unloaded his van, and was sitting on the barracks porch when the police arrived at 4:00 p.m.
Appellant’s alibi defense was countered by the Government with the testimony of a neighbor, who identified appellant’s van near his house around 3:30 p.m. Another witness, Ms. Melanie Young, the Alamedas’ next door neighbor, heard screaming followed by frantic pounding on her front door, as well as pounding on another neighbor’s door shortly after 3:00 p.m. Ms. Young found an hysterical Mrs. Alameda knocking on doors crying “[h]elp me.” Ms. Young saw bruising and redness on various parts of the victim’s body, as well as the open window through which the victim escaped from her bedroom. Mrs. Alameda told Ms. Young that appellant had come home, knocked on the door, and then tried to kill her by choking her.
The Government’s theory of the case was that appellant intended to kill his wife without being caught. Using the chaplain’s counseling session as an alibi was a part of appellant’s scheme. Another means utilized by appellant for avoiding detection was the use of latex gloves to preclude fingerprinting and masking tape to muffle any sounds.[1]
Appellant was charged with attempting to kill his wife. Both before and after his arrest, appellant did not make any statement such as “I could not have done that,” “I wasn’t there,” or ask, “Why are you arresting me?” During his questioning of Technical Sergeant (TSgt) Moody, a member of the Air Force Security Forces (Security Forces), the assistant trial counsel conducted the following direct examination:
Q. So, after your back-up arrived, what did you do next?
A. After my back-up arrived, I got out of the vehicle and I pretty much approached Airman Alameda. In route to approaching Airman Alameda, I came by his van and I just kind of rubbed my hand across his van to try and determine whether or not the van had just been operated. I was unable to tell because the van was hot and it was a hot day out and I was unable to tell whether the motor had just been running because the motor is encased.
And so, I approached Airman Alameda and asked him if he was Airman Alameda, and he said that he was. The gentleman who was next to him, I asked him if he could just move out of the way. I asked Airman Alameda for an ID card to prove that he was Airman Alameda. He did show me an ID card.
Q. Did he ask any other questions during this time?
A. No.
Q. Did he say anything, like ‘What do you want? What are you here for?” or anything like that?
A. No.
DC: Objection, Your Honor. Irrelevant.
MJ: Overruled.
[Questions by assistant trial counsel]
Q. Did he make any such statement as that?
A. No, sir, he did not.
Drawing from this colloquy, appellant states:
Thus, without question, the prosecutor elicited testimony from the arresting officer, a member of the Air Force Security Forces, that [appellant] remained silent after he was placed under arrest. The prosecutor later emphasized that fact in argument as an indication of consciousness of guilt.
*205 Although an entirely appropriate objection was made, it was overruled and the trial counsel continued.
Brief on Behalf of Appellant at 7 (emphasis in original). However, several key factors undercut appellant’s argument.
All questions and answers transpiring pri- or to appellant’s relevance objection concerned appellant’s silence before he was placed under arrest. Clearly, the approaching Security Forces officer said nothing to solicit a response from appellant other than to ask for his identification card. In fact, there is no evidence in the record of trial that anyone questioned appellant outside his dormitory that evening.
The only matter appellant objected to, based on relevance, was the assistant trial counsel’s questions concerning appellant’s reaction upon seeing the Security Forces officer. It was only after the last question and answer quoted above that TSgt Moody arguably placed appellant under arrest. The testimony of TSgt Moody on direct examination continued as follows:
Q. After you verified it was, in fact, Senior Airman Tedio Alameda, what did you do next?
A. I informed him that he was going to be apprehended for an alleged assault.
Q. And what did he say or do then?
A. He didn’t say anything. He didn’t do anything. He had a look like [witness stared ahead] and that was it.
Q. Did he ask you why he was being arrested?
A. No he did not.
The above questions and answers drew no objection from trial defense counsel. The assistant trial counsel continued his questioning:
Q. (Counsel). Did he act like he knew what was going on?
DC: Objection, Your Honor. Calls for speculation. (Emphasis added.)
MJ: Again, you can ask him what he observed, but you can’t ask him for those types of conclusion of whether or not he did understand.
Q. So, again, when you asked Airman Alameda for his ID card, did he say anything?
A. No, sir.
Q. And when you told him that he was being apprehended, did he say anything?
A. He said—
DC: Objection. Asked and answered, Your Honor. (Emphasis added.)
MJ: I’ll allow it, as long as you move on.
Q. Yes, Your Honor.
Q. How would you describe Airman Alameda’s reaction after you told him he was being placed under arrest?
A. Once again, just as in the previous situation where I had made contact with Airman Alameda, he didn’t have much of a reaction or much emotion at all.
Trial defense counsel raised two objections. The first was “speculation.” The military judge essentially sustained that objection by counseling the assistant trial counsel not to ask questions about what appellant’s thoughts were. However, for purposes of the issues he now raises on appeal, appellant’s objection was off the mark. Trial defense counsel did not comment on the judge’s ruling because the military judge ruled appropriately on the defense objection.
The second objection, “asked and answered,” occurred after the assistant trial counsel asked TSgt Moody if appellant said anything while he was being arrested. The military judge responded by telling the assistant trial counsel to move along. The judge’s ruling granted relief to the defense in response to the specifically raised objection. TSgt Moody responded, appellant “didn’t have much of a reaction or much emotion at all.” He did not comment directly on what appellant said or did not say.
In a lengthy closing argument, the Government mentioned that when the Special Forces came, the defendant never asked why they were present. Additionally, the Government made reference to the items found—the rubber gloves, the knife and *206 tape—as evidence of consciousness of guilt and a premeditated intent to murder.
DISCUSSION
MIL.R.EVID. 103
Mil.R.Evid. 103(a)(1), Manual for Courts-Martial, United States (2000 ed.), requires a “timely objection ... stating the specific ground of objection, if the specific ground was not apparent from the context....” “Further, [t]he burden is placed on the party opponent [to make the objection], not the judge.”[2] Where the evidence is otherwise admissible, it is not the judge’s role to require a proffer to show that it is admissible. Likewise, a general objection that the evidence is irrelevant will not suffice.[3] Furthermore, the objection only preserves the specific ground named. Thus, even though there was a good but unnamed objection, that objection will not be considered on appeal.[4]
In this instance, the only objection made to appellant’s pre-arrest silence was relevance. This objection did not preserve any potential objection to the evidence pursuant to the strictures of Article 31, the Fifth Amendment, or Mil.R.Evid. 304(h)(3). Trial defense counsel’s other objections (“speculation” and “asked and answered”), likewise did not preserve the issues now addressed.
CONTRADICTION
During the trial, from the opening statement through trial defense counsel’s examination of the witnesses, the defense’s theory of the case was alibi;[5] appellant was with the chaplain and it would have been physically impossible for him to attempt to kill his wife. Appellant’s silence at the time of arrest undermines the defense theory. His silence confirms both the direct and circumstantial evidence that he committed the offense.
FIFTH AMENDMENT and ARTICLE 31
The Fifth Amendment, swpm, states: “No person ... shall be compelled in any criminal ease to be a witness against himself----” Likewise, Article 31(d) prohibits the admission of statements obtained as a result of coercion or unlawful inducement. Thus, at trial, the prosecution may not use the evidence that appellant stood mute. Miranda v. Arizona, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Setting aside demeanor evidence at the time of arrest, silence has been recognized as evidence of guilt for hundreds of years. “An early exposition of the rule is the maxim of Pope Boniface VIII: ‘Qui tacet, consentiré videtur,’ or ‘He who is silent shows agreement’.” 5 Pope Boniface VIII, Book of Decretals, ch. 12 § 43 (c. 1300). United States v. Cook, 48 MJ 236, 241 n.1 (1998)(Crawford, J., dissenting). Certainly silence is ambiguous. But many courts have recognized that absent a Miranda warning, silence may be admitted.
The Supreme Court has addressed the issue of pre-arrest silence and post-arrest silence, absent Miranda warnings. While federal courts are split on the admission of *207 silence as substantive evidence,[6] some have allowed prosecutors to comment on such evidence. In Jenkins v. Anderson, 447 U.S. 231, 238, 240, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), and Fletcher v. Weir, 455 U.S. 603, 607, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982)(per curiam), the Court held that absent Miranda warnings, pre-arrest or post-arrest silence may be used to impeach a defendant.
In Jenkins, the defendant, who was indicted for murder, claimed that he acted in self-defense. Jenkins, 447 U.S. at 233, 100 S.Ct. 2124. At trial, the prosecution cross-examined Jenkins about his failure to explain his version of events to the police for at least two weeks. Id. The prosecutor also referred to the defendant’s previous silence in his closing argument. Id. at 234, 100 S.Ct. 2124. On appeal the Supreme Court held[7] that the Fifth Amendment, supra, was not violated by the prosecutor’s use of the defendant’s prearrest silence to impeach his credibility. Id. at 238, 100 S.Ct. 2124. The Court expressly noted that it did “not consider whether or under what circumstances prearrest silence may be protected by the Fifth Amendment.” Id. at 236 n. 2, 100 S.Ct. 2124.
Justice Stevens, concurring in the judgment, commented that he “would reject [the defendant’s] Fifth Amendment claim because the privilege against compulsory self-incrimination is simply irrelevant to a citizen’s decision to remain silent when he is under no official compulsion to speak.” Id. at 241,100 5. Ct. 2124 (footnote omitted). Likewise, Justice Stevens noted that under his approach, “assuming relevance, the evidence could have been used not only for impeachment[,] but also in rebuttal even had petitioner not taken the stand.” Id. at 244 n. 7, 100 S.Ct. 2124. In essence, this evidence could be used to rebut Jenkins’ self-defense theory.
The Court addressed post-arrest silence in Fletcher v. Weir, supra. Following Jenkins, it held that post-arrest silence, absent Miranda warnings, may be used to impeach the defendant at trial. Fletcher, 455 U.S. at 607, 102 S.Ct. 1309. In both cases the Court noted that Miranda warnings, that might have induced silence, were not given. While the Jenkins and Fletcher decisions permit pre-arrest and post-arrest silence, absent a Miranda warning, to be used for impeachment, they did not address the use of such silence as substantive evidence. Nonetheless, the Justices’ rationale in these opinions, coupled with the Fifth Amendment’s history, would permit the Government to use appellant’s silence under the facts of this case.
While the federal courts are split on whether to permit use of pre-arrest silence and post-arrest silence as substantive evidence in the absence of rights warnings, the courts have permitted the prosecution to argue inferences arising from an individual’s conduct at the time of arrest. In United States v. Thompson, 82 F.3d 849 (9th Cir. 1996), the court permitted the prosecutor to comment on the appellant’s silence at the time of his arrest. Id. at 854. During a drug transaction in his house, the appellant killed a man with muffled shots. When the police arrived, the appellant answered some police questions but refused to answer others because he said he was scared and wanted to talk to a lawyer. Id. The detective who interviewed the appellant testified that when he responds to this kind of call he normally asks the people to indicate what happened, and they “are more than eager to tell.... ” Id.
In Thompson, the prosecutor made the following comment concerning the defendant’s refusal to answer police questions before his arrest:
*208 I am not going to make a big deal out of Mr. Thompson’s response when the police come [sic] to the door following this shooting. I’m not going to make a big deal about it at all. But you got to admit, it’s a little strange under the circumstance, have the police come in there, and the first thing they’re going to say is, “What happened?” “I want a lawyer.” I mean, that’s strange. That’s not the way people in circumstances that are legitimate are going to react. They would probably be inclined to tell the cop what happened; “This guy broke into my apartment.” None of that happened. But then again, this is Mr. Thompson.
Id. at n. 7. After noting the split in federal courts on the issue of silence as substantive evidence, the Ninth Circuit held that the prosecutor’s comment was not plain error. Id. at 856 (citing United States v. Davenport, 929 F.2d 1169, 1174-75 (7th Cir.1991)).
In the case before us, TSgt Moody testified that appellant did not say anything like “What do you want?”, or “What are you here for?” However, TSgt Moody did describe appellant’s demeanor. Asked if he reacted in any way, the witness indicated that appellant “stared [straight] ahead.”
When an individual has received rights warnings and told of the right to remain silent, silence becomes an intentional act. It is the exercise of one’s right. But the privilege against self-incrimination “protects an accused only from being compelled to testify against himself, or otherwise provide ... evidence of a testimonial or communicative nature. ...” Schmerber v. California, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Neither the Fifth Amendment nor Article 31 protects an individual from giving physical evidence such as handwriting, voice exemplars, or demonstrating one’s sobriety. See Pennsylvania v. Muniz, 496 U.S. 582, 591, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990).
Appellant was not an individual who was relaxed or unemotional. His body language of looking straight ahead, when confronted, was evidence that the court members could consider and could be commented upon by the prosecution. Such evidence is neither testimonial nor communicative in nature. While the judge had the discretion to exclude the evidence, especially after a proper objection, there was absolutely no abuse of discretion in failing to do so.
The trial counsel’s comments in this case were a fair response to the trial defense counsel’s opening statement and examination of the witnesses. United States v. Shoff, 151 F.3d 889, 893 (8th Cir.1998). Additionally, in an argument that went more than 30 minutes, trial counsel’s statement that appellant made no explanation and stared straight ahead, was only a passing reference not requiring a reversal of the conviction. See, e.g., United States v. Sidwell, 51 MJ 262, 265 (1999).
Certainly, appellant’s reaction undercuts the defense’s theory throughout the case that appellant had nothing to hide. In fact, appellant recognized the impact of his silence because the next day he told his escorts he was at the chaplain’s office at the time of the offense, and wondered why he was being placed in pretrial confinement. He could have said that one day earlier, but did not.
HARMLESS ERROR
The evidence in this case is overwhelming. The majority recognizes that appellant may very well be guilty of a lesser-included offense, but improperly assumes the lower court’s Article 66(c), UCMJ, 10 USC § 866(c), role and makes findings that are equivalent to findings of fact regarding premeditation and appellant’s intent to kill. The evidence admitted at trial of appellant’s intent to kill his wife is far greater than the majority opinion indicates. I am particularly disturbed by the majority’s failure to consider appellant placing a Hefty garbage bag over the victim’s head and the use of deadly force with a butcher knife to intimidate his wife on a prior occasion. The majority’s view indicates that if a person assaults and wounds a victim on one occasion, because the perpetrator intended to assault and wound that victim, this same perpetrator could not be convicted of attempting to murder the same victim at a later date, even though that was the perpetrator’s specific intent. Even if one were to accept the majority’s view that *209 the evidence of premeditation was inadmissible, there is more than sufficient evidence that appellant intended to kill his wife. The Court of Criminal Appeals should be able to consider unpremeditated murder and manslaughter as lesser-included offenses.
CONCLUSION
For all of these reasons, I respectfully dissent.

. This Court is not bound by the lower court's decision that the utility knife, masking tape, and latex gloves were not relevant evidence. See United States v. Walker, 57 MJ 174 (2002) (Sullivan, S.J., joined by Crawford, C.J., dissenting). Even without this evidence, there is substantial evidence of the premeditated intent to kill.

. John W. Strong, 1 McCormick on Evidence § 52 at 220 (5th ed. 1999).

. United States v. Sandini, 803 F.2d 123, 126-27 (3d Cir.1986). See United States v. Adkins, 196 F.3d 1112, 1116 n. 3 (10th Cir.1999)(a nonspecific objection does not preserve a Rule 403 objection); United States v. Wilson, 966 F.2d 243, 245-46 (7th Cir. 1992)(failure to cite Rule 403, or mention the prejudicial effect of the evidence, constitutes waiver); United States v. Mejia, 909 F.2d 242, 246 (7th Cir.1990)(relevance objection does not preserve Rule 403 or Rule 404(b) objection); United States v. Gomez-Norena, 908 F.2d 497, 500 (9th Cir.1990)(only making the correct specific objection preserves issue for appeal); Bryant v. Consolidated Rail Corp., 672 F.2d 217, 220 n. 4 (1st Cir.1982)(relevance objection does not preserve ruling under Rule 404).

. United States v. Gomez-Norena, supra. See also United States v. Brewer, 43 MJ 43, 47 n. 2 (1995)(failure to make specific objection constitutes waiver absent plain error).

. See, e.g., Shafer v. South Carolina, 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001)(prosecu-tor’s closing argument that Shafer and his two accomplices “might come back” opened the door to show future dangerousness and required an instruction of life without parole); United States v. Franklin, 35 MJ 311, 317 (CMA 1992)(trial defense counsel’s opening statement opened the door to the issue of intent). See also United States v. Turner, 39 MJ 259, 263 n. 2, 266-67 (CMA 1994).

. Three circuits have indicated that silence as substantive evidence of guilt is admissible in the prosecution's case-in-chief. See, e.g., United States v. Oplinger, 150 F.3d 1061 (9th Cir.1998); United States v. Zanabria, 74 F.3d 590 (5th Cir.1996); United States v. Rivera, 944 F.2d 1563 (11th Cir.1991). Four have concluded otherwise. See, e.g., Combs v. Coyle, 205 F.3d 269, 283 (6th Cir.2000); United States v. Burson, 952 F.2d 1196 (10th Cir.1991); Coppola v. Powell, 878 F.2d 1562 (1st Cir.1989); United States ex rel. Savory v. Lane, 832 F.2d 1011 (7th Cir.1987).

. Justice Powell wrote the majority opinion. Justice Stevens concurred in the judgment and Justices Brennan and Marshall dissented.