UNITED STATES, Appellee

v.

Tedio ALAMEDA, Senior Airman
U.S. Air Force, Appellant

No. 01-0534

Crim. App. No. 33529

United States Court of Appeals for the Armed Forces

Argued April 3, 2002

Decided August 28, 2002

GIERKE, J., delivered the opinion of the Court, in which
BAKER, J., and COX, S.J., joined.  EFFRON, J., filed an opinion
concurring in part and dissenting in part.  CRAWFORD, C.J., filed
a dissenting opinion.

<u>Counsel</u>

For Appellant:  <u>Jack B. Zimmermann</u> (argued); <u>Captain Shelly W.
   Schools</u>, <u>Terri R. Z. Jacobs</u>, and <u>Kyle R. Sampson</u> (on brief);
   <u>Major Jefferson B. Brown</u>.

For Appellee:  <u>Captain Adam Oler</u> (argued); <u>Colonel Anthony P.
   Dattilo</u> and <u>Lieutenant Colonel Lance B. Sigmon</u> (on brief).

Military Judge:  Kurt D. Schuman

**<u>This opinion is subject to editorial correction before final publication</u>.**

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of attempted premeditated murder, disobeying the order of a superior commissioned officer, assault consummated by a battery, and communicating a threat, in violation of Articles 80, 90, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 USC §§ 880, 890, 928, and 934, respectively. The adjudged and approved sentence provides for a dishonorable discharge, confinement for 18 years, total forfeitures, and reduction to the lowest enlisted grade. Pursuant to Article 58b, UCMJ, 10 USC § 858b, the convening authority waived automatic forfeitures for the benefit of appellant's spouse and children. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion.

This Court granted review to determine whether the findings and sentence should be set aside because appellant's rights under the Fifth Amendment to the United States Constitution and Article 31, UCMJ, 10 USC § 831, were violated when the prosecution elicited testimony that appellant remained silent when he was

apprehended, and then commented on his silence during final argument.[1]  For the reasons set out below, we reverse.

### Factual Background

The charges arose from two incidents between appellant and his wife.  The first incident was on April 30, 1998 and the second on May 19, 1998.

Mrs. Alameda testified that appellant engaged in a pattern of physical and verbal abuse, domination and control, and threats to kill her that began in 1990, while he was undergoing technical training shortly after he enlisted in the Air Force, and continued until appellant was placed in pretrial confinement as a result of the charges that are the subject of this appeal.  Mrs. Alameda was medically evacuated from Kadena Air Base (AB), Okinawa, Japan, in 1991 because of stress and depression that she attributed to appellant's behavior.  She described an incident at McGuire Air Force Base, New Jersey, between appellant's two tours of duty at Kadena AB, in which appellant held a large butcher

---

[1] We heard oral argument in this case at the Seattle University School of Law, Seattle, WA, as part of the Court's "Project Outreach."  See United States v. Pritchard, 45 MJ 126, 127 n.1 (1996).  The granted issues are:

> I. WHETHER THE FINDINGS AND SENTENCE SHOULD BE SET ASIDE BECAUSE APPELLANT'S RIGHT TO REMAIN SILENT UNDER THE FIFTH AMENDMENT WAS VIOLATED WHEN THE PROSECUTION ELICITED TESTIMONY THAT APPELLANT DID NOT RESPOND VERBALLY WHEN ARRESTED, AND WHEN THE PROSECUTION COMMENTED ON THIS DURING FINAL ARGUMENT.

> II. WHETHER THE FINDINGS AND SENTENCE SHOULD BE SET ASIDE BECAUSE APPELLANT'S RIGHT TO REMAIN SILENT UNDER ARTICLE 31(b), UCMJ, WAS VIOLATED WHEN THE PROSECUTION ELICITED TESTIMONY THAT APPELLANT DID NOT RESPOND VERBALLY WHEN ARRESTED, AND WHEN THE PROSECUTION COMMENTED ON THIS DURING FINAL ARGUMENT.

knife against her throat, threatened to kill her, and shoved her into a door, fracturing her jaw. Appellant and Mrs. Alameda were divorced in 1993 and then remarried in 1994.

Mrs. Alameda testified that on the morning of April 30, 1998, appellant became upset when he discovered an e-mail message on her computer from a male high school friend of hers who wanted to visit her in Okinawa. According to Mrs. Alameda, appellant tossed the computer off the table, smashed the telephone when she tried to call for help, "flicked" a towel at her head, shoved and grabbed her, punched her on the back of her head and her back, and threatened to kill her. She testified that after appellant departed for work, she e-mailed a friend and neighbor, Tammy Warner, and asked her to call the Air Force Security Forces (Security Forces).

After the Security Forces investigated the incident, appellant's commander, First Lieutenant (1Lt) Deborah Haussler, ordered appellant to move out of the family quarters and into a dormitory. She gave appellant a written order prohibiting him from having any contact with his wife and child, unless it was prearranged by certain named members of the unit.

About a week later, the Family Advocacy therapist contacted 1Lt Haussler and expressed concern that she had been unable to contact Mrs. Alameda. 1Lt Haussler visited the therapist and examined Mrs. Alameda's Family Advocacy file, which revealed that appellant had violated a similar "stay away" order on a previous occasion. 1Lt Haussler became concerned about Mrs. Alameda's welfare and decided to visit her at home "to make sure she was

okay." While visiting Mrs. Alameda, 1Lt Haussler noticed bruises on Mrs. Alameda's upper arms.

Sometime during the week of May 12, 1998, 1Lt Haussler received an "early return of dependents" (ERD) packet to allow Mrs. Alameda and her son to leave Okinawa at government expense before appellant completed his tour of duty. She did not know how the ERD packet originated. She informed appellant that he needed to sign the packet. He refused to sign it because he did not want his son to leave Okinawa. 1Lt Haussler subsequently learned that an ERD request could be approved without the military member's signature, and she informed appellant on May 18 that the request would be processed without his signature. 1Lt Haussler contacted Mrs. Alameda at approximately 2:30 p.m. on May 19, and they made an appointment for Mrs. Alameda to sign the ERD request in 1Lt Haussler's office at about 3:30 p.m. on that day.

On the morning of May 19, Mrs. Alameda contacted the squadron first sergeant and told him that she needed money for food. When her request was transmitted to appellant, he expressed concern that his money was not being used for food. With the approval of the first sergeant, appellant purchased food at the base commissary and, accompanied by two noncommissioned officers, took the food to the family residence in the early afternoon. While at the residence, appellant gathered some personal clothing and effects, and downloaded some information from his computer. His escorts returned to the squadron, arriving at about 2:15 p.m. Appellant departed the family residence in his own vehicle. He did not return to work with his

escorts because, as he told his supervisor, he wanted to see a chaplain.

Chaplain (Captain) Tim Wagoner testified that he received a call from appellant, asking to see him. Base telephone records established that the call was at 1:55 p.m. Appellant told Chaplain Wagoner that he was at Chapel 2; Chaplain Wagoner was at Chapel 1. Chaplain Wagoner agreed to see appellant, who came to Chapel 1. Both chapels are near the housing area where the Alameda residence was located. According to the telephone records and Chaplain Wagoner's testimony, appellant called his unit at 2:09 p.m. and told them that he was with the chaplain. Chaplain Wagoner testified that he counseled appellant for "a little better than an hour." He was not sure whether he had finished counseling appellant when he made another telephone call at 3:10 p.m.

Mrs. Alameda departed her on-base place of employment at about 3:00 p.m. in anticipation of her appointment with 1Lt Haussler. She arrived at home at about 3:15 p.m., saw the groceries, and noticed that some of appellant's clothing that she had set aside had been disturbed. She called 1Lt Haussler and complained that appellant had been in the house in spite of the "stay away" order, had left her groceries instead of money, and had rummaged through her belongings. 1Lt Haussler told her, "come down to my office, sign the ERD letter. We'll get you off this island as quickly as we can." Mrs. Alameda responded that she would come immediately.

Mrs. Alameda testified that as she was leaving the residence, appellant entered. She testified that when she saw

6

appellant, she "was hysterical . . . [and] completely freaked out that he was standing in front of [her]." She testified that appellant tried to calm her down. She moved to a corner of the room, appellant sat on a couch, and he started asking, "Do you want a divorce? Do you want this?" She did not respond. They began to move around the house. Appellant was putting his hands on her because she "was trying to scream out and stuff," and "trying to get away." She testified, "Every move I made, he was right on top of me."

Mrs. Alameda testified that at one point, appellant was behind her and he covered her mouth and pinched her nose so that she could not breath. She struggled free and ran toward the door. She saw appellant pulling a Hefty garbage bag from his pocket. It was black with yellow straps, tightly folded, and appeared to have never been opened. Appellant was trying to hold her with one hand and unfold the bag with the other. She tried to get away and appellant grabbed her from behind. She testified, "[H]e got it up as far as my face and stuff, and was trying to get it open to where he could get it over my head and stuff, but I ended up ducking down, struggling, and getting out."

Mrs. Alameda testified that she ran into the bedroom, telling appellant that she would do "[w]hatever you want me to do." She asked him, "Please, let's go back into the living room and talk." As appellant turned around to go into the living room, she slammed the bedroom door and locked it, and then crawled out a window.

She ran across the street, screaming. A neighbor, Melanie Young, let Mrs. Alameda into her house, where Mrs. Alameda called 1Lt Haussler.

On cross-examination, Mrs. Alameda testified that she did not remember whether she told the Security Forces that appellant had attempted to "strangle" her. In response to defense counsel's questions, she insisted that appellant did not try to strangle her, but tried to put the garbage bag over her head.

1Lt Haussler testified that Mrs. Alameda called her at 3:45 p.m. and was screaming that appellant had been in the house and tried to kill her. 1Lt Haussler called the Security Forces and then drove to the Alameda residence.

Both 1Lt Haussler and Ms. Young noticed red marks around Mrs. Alameda's neck. A doctor at the base hospital noticed that she had superficial abrasions on her neck and scratches on her nose. He also noticed bruises on her arm and leg, and a "goose egg" on the back of her head.

Technical Sergeant (TSgt) Gowan and his wife drove past the Alameda quarters at about 3:15 p.m. on May 19. They both testified that they saw a van, later determined to be appellant's, parked near the Alameda residence at about 3:15 p.m.

TSgt Eugene Moody, a member of the Security Forces, was on routine patrol when he was directed to respond to the Alameda residence. He knew where it was because he had also responded to the April 30 incident as well as an earlier incident. In response to a question from trial counsel, TSgt Moody testified that when he observed appellant after the April 30 incident,

8

appellant "pretty much was without any emotion, just a plain look
. . . ."

When TSgt Moody arrived at the Alameda residence on May 19, he noticed that the bedroom window was open with the blinds hanging out the window. Mrs. Alameda was "excited, and . . . definitely upset." According to TSgt Moody, Mrs. Alameda said that appellant "had a bag around [her] neck" and tried to kill her. He testified that he thought she meant that appellant had put the bag around her neck, but she was not "really clear." TSgt Moody observed that Mrs. Alameda had red marks on the sides of her neck.

TSgt Moody then began to look for appellant. He began by searching the street adjacent to the Alameda residence and then proceeded to the dormitory area. Based on a description of appellant's van, he located it in the dormitory area and saw appellant sitting on the dormitory stairs, talking to another individual. TSgt Moody called for another unit to assist. When it arrived, TSgt Moody approached appellant and asked him if he was Airman Alameda, and appellant responded that he was. TSgt Moody asked the person next to appellant to move away, asked appellant for his identification card, and appellant complied. As the trial counsel continued the direct examination of TSgt Moody, the following colloquy occurred, giving rise to the granted issues:

> Q. Did he ask any other questions during this time?
>
> A. No.
>
> Q. Did he say anything like, "What do you want? What are you here for?" or anything like that?

A. No.

DC: Objection, Your Honor.  Irrelevant.

MJ: Overruled.

[Questions by assistant trial counsel]

Q. Did he make any such statement as that?

A. No, sir, he did not.

Q.  After you verified it was, in fact, Senior Airman Tedio Alameda, what did you do next?

A.  I informed him that he was going to be apprehended for an alleged assault.

Q.  And what did he say or do then?

A.  He didn't say anything.  He didn't do anything.  He had a look like [witness stared ahead] and that was it.

Q.  Did he ask you why he was being arrested?

A.  No, sir, he did not.

Q.  Did he act like he knew what was going on?

DC:  Objection, Your Honor.  Calls for speculation.

MJ:  Again, you can ask him what he observed, but you can't ask him for those types of conclusions of whether or not he did understand.

Q.  So, again, when you asked Airman Alameda for his ID card, did he say anything?

A.  No, sir.

Q.  And when you told him that he was being apprehended, did he say anything?

A.  He said -

DC:  Objection.  Asked and answered, Your Honor.

MJ:  I'll allow it, as long as you move on.

ATC:  Yes, Your Honor.

Q. How would you describe Airman Alameda's reaction after you told him he was being placed under arrest?

A. Once again, just as in the previous situation where I had made contact with Airman Alameda, he didn't have much of a reaction or much emotion at all.

On cross-examination, defense counsel asked TSgt Moody if Mrs. Alameda used the word, "strangle." He responded,

No. I remember, "He was trying to kill me. He was trying to strangle me. He was trying to -- he had a bag around my neck and trying to strangle me." But the term "strangle" was in there also.

Staff Sergeant (SSgt) Steven Anthony was directed to search appellant's dormitory for a "dark brown or black plastic garbage bag with yellow drawstrings." He searched the entire dormitory, and he found a box of Hefty garbage bags matching that description in a trash can in a common bathroom. Later examination by an agent of the Air Force Office of Special Investigations (OSI) revealed that one garbage bag had been removed from the box and 19 were remaining. A latent finger print on the Hefty box was identified as appellant's. A stipulation of expected testimony of a member of the dormitory custodial staff established that the custodial staff did not use Hefty garbage bags, and that the trash cans in the bathrooms were emptied daily.

In the same trash can, SSgt Anthony found an unopened package of latex gloves and a utility knife, both in their respective original packaging. SSgt Anthony also found a plastic bag bearing the logo of the Army and Air Force Exchange Service (AAFES), containing an unopened roll of 2-inch masking tape, and an AAFES receipt dated May 16 reflecting a purchase of coffee,

utility knife, latex gloves, a roll of masking tape, and a pack of GPC cigarettes.  The plastic bag was located in a trash can across the bathroom from the one where he found the Hefty garbage bags.

The plastic bag, receipt, roll of masking tape, latex gloves, and utility knife were received in evidence over defense objection.  The defense argued that the items had not been connected to appellant.  The prosecution argued that the items were relevant to show premeditation, and that they were sufficiently linked to appellant by the fact that the cigarettes were the same brand appellant smoked, and that all the items were thrown away at about the same time, in the same new condition as the Hefty garbage bags, in the common bathroom of appellant's dormitory.  The military judge admitted the evidence, finding the items relevant to show "some sort of a plan or premeditation."

On a date not reflected in the record, Mrs. Alameda delivered a pack of GPC cigarettes to the OSI and informed them that appellant had dropped them during the May 19 altercation.  A fingerprint lifted from the cigarette pack was not appellant's.

Appellant did not testify.  His counsel concentrated on attacking the credibility of the Government witnesses, especially Mrs. Alameda.  In addition, the defense presented the testimony of three witnesses to contradict Mrs. Alameda's testimony.

The defense presented the stipulated testimony of a senior airman who was involved in the in-processing of appellant into the confinement facility during the early morning hours of May 20, 1998.  The stipulation recites that appellant was in possession of a partially empty package of GPC cigarettes when he

was in-processed.  This testimony was offered to contradict Mrs. Alameda's statement that appellant inadvertently left his cigarettes in the family quarters on May 19.

The stipulated testimony of Mrs. Crystal Hammond recites that she did not hear any "yelling, screaming, or other loud noises coming from the Alameda residence."  It further adds that Mrs. Hammond would testify that she was asleep with the television on between approximately 3:00 p.m. and 4:00 p.m., with the windows and doors closed, and that, under these circumstances, she could hear very little, if anything, from outside.

A nine-year-old girl, whom Mrs. Alameda observed when she ran out of her apartment, testified that Mrs. Alameda left from her front porch, not from a bedroom window.  The girl testified that when she saw Mrs. Alameda, the latter "was standing right on the porch, putting her keys in."  She also testified that Mrs. Alameda locked the doors to her car, which was parked in a space marked with the number of her house.

Before closing arguments, when the military judge instructed the members, he included the following admonition:

> The accused has an absolute right to remain silent.
> You will not draw any inference adverse to the accused
> from the fact that he did not testify as a witness.
> The fact that the accused has not testified must be
> disregarded by you.

During arguments on findings, trial counsel made a specific reference to TSgt Moody's testimony about appellant's lack of reaction or response when he was apprehended.  The following exchange took place in the presence of the members:

13

TC: ". . . And lo and behold, the cops came and picked me up, and I was just sitting there on the steps, didn't know what this was about," but didn't bother even to ask.

Now, does that indicate consciousness of guilt? The police come and say, "Stand up" --

DC: Objection, Your Honor. The accused is under no obligation to make a statement and this drawing an adverse inference from his failure to proclaim his innocence.

TC: Your Honor, the witness testified about what he said and did when they apprehended him.

MJ: I think it's fair comment on the state of the evidence. However, I will emphasize once again the fact that this accused is under absolutely no obligation to make any statement during the trial in his defense.

TC: Yes, Sir.

TC: And when Sergeant Moody approaches him on the steps and says, "Are you Tedio Alameda? Stand up. You, man, get away from him. Let me see your identification card." He doesn't even say, "What's this all about?" Even though --

DC: Object again, Your Honor. I believe this is not fair comment on the evidence. This is comment on his exercise of his right to remain silent.

TC: Your Honor, the witnesses testified in this court, without objection, to that specific fact.

MJ: With regard to he did not ask what was going on?

TC: That's right.

MJ: Okay. Now we've got that. We know that is in evidence. Now with regard -- nothing will be held against this accused because he did not say anything in his defense. Okay? So let's keep this very clear.

Regarding the items found in the dormitory bathroom, trial counsel argued that they showed a premeditated intent to kill. Trial counsel further argued that appellant sat in the chaplain's office and thought to himself: "I'm leaving here and I'm going to go take that whore out. And I've got the implements in my car.

I've got the box of bags. I've got the rubber gloves. I've got the knife. I've got the tape." Trial counsel continued his argument:

> Who knows what sinister plan he had in mind? That he was going to subdue her with the bag? Gag her and bind her with the tape? Cut her wrists? Cut her throat? Keep the blood off his hands?
>
> And then when he fails, when he fails because she's smart enough to get the door between them and she gets out the window, he gets out of that house. And he runs down, he gets in his van where he's got it parked with the door facing the hill, so all he has to do is hop in, and he goes back to the dormitory very quickly, and he says, "Jeez [sic], I better get rid of all these things that are involved in this." And he runs upstairs and he throws the box of bags in the trash in the common area bathroom, and the rest of the implements, too. The rest of the new implements bought on the 16th of May, three days before. Premeditation.
>
> Same place. Same time. Same condition. Consciousness of guilt. Proof of premeditated design to kill. And intent to kill. Is there any other intent here that is even reasonably inferable? Putting a bag over somebody's head right before they get off the island? Was he just going over for one more exercise at control? One more exercise of dominance? I just want to get one last lick in before you go?
>
> Or was he instead going over there to keep her from going? Perhaps to put her body in different bags, throw her in the bay, pick up his boy at day care, and claim he didn't know anything about it.
>
> The evidence is overwhelming. Attempted premeditated murder. Intent to kill. Not just a credibility contest.

After deliberating for approximately eight hours over a two-day period, the court members convicted appellant as charged.

The Court of Criminal Appeals held that the military judge erred by admitting the utility knife, masking tape, and gloves because they were not sufficiently connected to appellant. The court below held, however, that the error was harmless. The Government does not contest that holding. The court below did

not address the admissibility of the testimony about appellant's silence at the time of his apprehension, or the trial counsel's argument that the silence was indicative of a consciousness of guilt.

## Discussion

Appellant now asserts that his right to remain silent under the Fifth Amendment and Article 31 was violated when the trial counsel elicited testimony from TSgt Moody about his post-apprehension silence, and then argued that this silence reflected appellant's consciousness of guilt. Appellant further asserts that the military judge exacerbated the error when he advised the members that appellant had no obligation to testify at trial, but did not advise them that he had the right to remain silent when he was apprehended. Reply Brief on Behalf of Appellant at 9. The Government does not concede error, but argues that the issue was not preserved by a timely and specific objection, and that any error was harmless beyond a reasonable doubt. Final Brief on Behalf of the United States at 9-10.

## Waiver

Mil.R.Evid. 103(a), Manual for Courts-Martial, United States (2000 ed.),[2] provides that error "may not be predicated" on a ruling admitting evidence "unless the ruling materially prejudices a substantial right of a party," and there was a timely and specific objection. Mil.R.Evid. 103(d) sets out the plain error exception: "Nothing in this rule precludes taking

---

[2] All Manual provisions cited are identical to the ones in effect at the time of appellant's court-martial.

notice of plain errors that materially prejudice substantial rights although they were not brought to the attention of the military judge."

When trial counsel first elicited the testimony from TSgt Moody, it was not apparent that he intended to argue later that appellant's silence showed consciousness of guilt. The military judge summarily overruled defense counsel's relevance objection, without allowing either side to articulate reasons for or against admitting the testimony, and without articulating any rationale for admitting the evidence. If the military judge had required trial counsel to proffer a theory of relevance, the possible implication of the Fifth Amendment might have been apparent much earlier in the trial. We hold that defense counsel's objection challenging the relevance of TSgt Moody's testimony was sufficient to preserve the issue of the admissibility of that testimony in light of Mil.R.Evid. 304(h)(3). We further hold that defense counsel's timely objection to trial counsel's argument was sufficient to preserve the constitutional and statutory issues arising from trial counsel's use of the evidence as substantive proof of guilt.

## Relevance

Paragraph 140a(4) of the Manual for Courts-Martial, United States, 1969 (Rev. ed.), specifically recognized admissions by silence. It provided:

> If an imputation against a person comes to his attention under circumstances that would reasonably call for a denial by him of the accuracy of the imputation if the imputation was not true, a failure on his part to utter such a denial will support an inference that he thereby admitted the truth of the imputation.

This provision has since been deleted, but "admissions by silence continue to be recognized in both military and civilian federal practice."  United States v. Cook, 48 MJ 236, 240 (1998); see also United States v. Stanley, 21 MJ 249, 250 (CMA 1986)(silence considered an admission "under certain circumstances").

Mil.R.Evid. 304(h)(3) states when the inference may not be drawn.  It provides:

> A person's failure to deny an accusation of wrongdoing concerning an offense for which at the time of the alleged failure the person was under official investigation or was in confinement, arrest, or custody does not support an inference of an admission of the truth of the accusation.

See United States v. Colcol, 16 MJ 479, 484 n.4 (CMA 1983) (prearrest silence usually inadmissible and not an act from which guilt can be inferred).

We review a military judge's decision to admit evidence for abuse of discretion.  If the military judge makes findings of fact, we review the findings under a clearly-erroneous standard of review.  We review conclusions of law de novo.  United States v. Sullivan, 42 MJ 360, 363 (1995).

In this case, the military judge made no findings of fact or explicit conclusions of law.  Thus, we review his application of the law de novo.

TSgt Moody advised appellant that he was being apprehended for an "alleged assault."  Appellant had a history of domestic violence, had been accused of assaulting his wife less that two weeks earlier, and had been ordered to stay away from her because of the incident.  Under these circumstances, his failure to deny one more allegation of "alleged assault" does not support an

inference of guilt.  Thus, we conclude that appellant's lack of response was not relevant.

Finally, even if appellant's silence constituted an admission, it would admit only an "alleged assault," not attempted premeditated murder.  We hold that the military judge erred by admitting the evidence of appellant's silence as substantive evidence of guilt.

## Closing Argument

The privilege against self-incrimination recognized in Article 31(a), supra, is virtually identical to the privilege under the Fifth Amendment.  Thus, our Fifth Amendment analysis also applies to Article 31(a).

In closing argument, the trial counsel was permitted to argue, over defense objection, that appellant's lack of response when he was apprehended for an "alleged assault" reflected his consciousness of guilt of premeditated murder.  Issues involving argument referring to unlawful subject matter are reviewed de novo as issues of law.  See 2 Steven Childress & Martha Davis, Federal Standards of Review, § 11.23 (3d ed. 1999).

The federal circuits distinguish between pre-arrest and post-arrest silence.  They are divided on the question whether the prosecution may argue that pre-arrest silence is evidence of guilt.  However, the First, Sixth, Seventh, and Tenth Circuits, constituting a majority of the circuits that have addressed the issue, have held that use of pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment.  These circuits maintain "that application of the privilege is not limited to persons in custody or charged with a crime; it may also be

asserted by a suspect who is questioned during the investigation of a crime." Coppola v. Powell, 878 F.2d 1562, 1565 (1st Cir. 1989); see Combs v. Coyle, 205 F.3d 269, 282-83 (6th Cir. 2000)(citing Coppola, supra); United States v. Burson, 952 F.2d 1196, 1201 (10th Cir. 1991); United States ex rel. Savory v. Lane, 832 F.2d 1011, 1017 (7th Cir. 1987) (summarizing the split in the federal circuits and holding that comment on pre-arrest silence violates Fifth Amendment).

The Ninth Circuit has held that use of post-arrest, pre-Miranda[3] silence as substantive evidence of guilt violates the Fifth Amendment. United States v. Velarde-Gomez, 269 F.3d 1023, 1028 (9th Cir. 2001). A lack of response or reaction to an accusation is not "demeanor" evidence, but a failure to speak. Id. at 1031.

Mil.R.Evid. 304(h)(3) makes no distinction between pre-arrest and post-arrest silence. It applies to any person who "was under official investigation or was in confinement, arrest, or custody."

This case involves post-apprehension,[4] pre-Miranda silence. We conclude, based on the language of Mil.R.Evid. 304(h)(3) and what we perceive to be the weight of authority in the federal circuits, that the military judge committed constitutional error by permitting the prosecution to introduce evidence of

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

[4] Military cases use the term "apprehension" to mean the same thing as "arrest" in civilian cases. This difference in terminology is based on the definitions of "apprehension" and "arrest" in Articles 7 and 9, Uniform Code of Military Justice 10 USC §§ 807 and 809, respectively.

appellant's post-apprehension silence as substantive evidence of guilt, and to then comment on that evidence in closing argument.

## Curative Instructions

When a military judge instructs the members, the question whether the content of the instruction is legally correct is reviewed de novo.  See United States v. Quintanilla, 56 MJ 37, 83 (2001).

When defense counsel objected to trial counsel's argument that appellant's silence showed a consciousness of guilt, the military judge instructed the members that appellant had "no obligation to make any statement during the trial in his defense."  (Emphasis added.)  When defense counsel objected again, the military judge instructed the members that "nothing will be held against this accused because he did not say anything in his defense."  In our view, these instructions were off the mark because they did not address the question whether any adverse inference could be drawn from appellant's silence at the time of his apprehension.

Instead of curing the error, the instructions may have exacerbated it.  The instructions focused only on trial testimony and failed to address appellant's pretrial silence.  This omission may have led the members to conclude that, while no adverse inference could be drawn from appellant's failure to testify at trial, the members were permitted to draw an adverse inference from appellant's silence at the time of his apprehension.  Accordingly, we conclude that the military judge's instruction did not cure the error and may have exacerbated it.

## Harmless Error

This Court reviews de novo whether an error was harmless. United States v. Grijalva, 55 MJ 223, 228 (2001). We consider the four following factors to evaluate prejudice from erroneous evidentiary rulings: "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." United States v. Kerr, 51 MJ 401, 405 (1999)(citing United States v. Weeks, 20 MJ 22, 25 (CMA 1985)). We will apply these factors to analyze the cumulative impact of the erroneous admission of the masking tape, latex gloves, and utility knife, as well as the erroneous admission of testimony about appellant's pretrial silence as substantive evidence of guilt.

To analyze the impact of trial counsel's impermissible comment on appellant's silence, we must first determine whether this error is of constitutional magnitude. For constitutional error, we must be satisfied beyond a reasonable doubt that the error was harmless. Chapman v. California, 386 U.S. 18, 24 (1967). For non-constitutional error, we must be satisfied that "the judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765 (1946). If we are not satisfied, or if we are "left in grave doubt, the conviction cannot stand." Id.

The Supreme Court has drawn a distinction between direct review and collateral review in determining if impermissible comment on pretrial silence was harmless. The Supreme Court has applied the Chapman standard to direct review, and the less onerous Kotteakos standard to collateral review. Brecht v.

Abrahamson, 507 U.S. 619, 634-38 (1993).  Because this case is on direct review, we apply the Chapman standard.

Applying the four-pronged Weeks factors, we are satisfied beyond a reasonable doubt that the errors were harmless with respect to the two offenses on April 30.  Neither the irrelevant evidence nor the inadmissible evidence of appellant's silence pertained to these offenses.

We are likewise satisfied beyond a reasonable doubt with respect to appellant's conviction of violating the "stay away" order on May 19.  Mrs. Alameda's testimony was corroborated by the witnesses who observed the scratches on her nose and abrasions on her neck, the witnesses who observed appellant's car parked near the residence, TSgt Moody's description of the open bedroom window with the blinds hanging out, and the testimony of 1Lt Haussler and Melanie Young about Mrs. Alameda's demeanor immediately after her confrontation with appellant.

However, we are not persuaded beyond a reasonable doubt that the errors were harmless with respect the court members' finding that appellant acted with a premeditated design to kill Mrs. Alameda.  At trial, the military judge correctly instructed the members that the elements of attempted premeditated murder were:

> (1) That at or near Kadena Air Base, Okinawa, Japan, on or about 19 May 1998, the accused did certain acts, that is: attempt to murder Marla D. Alameda by means of suffocating and choking her with his hands and a plastic bag;
>
> (2) That such acts were done with the specific intent to kill Marla D. Alameda; that is, to kill without justification or excuse;
>
> (3) That such acts amount to more that mere preparation; that is, they were a substantial step and

a direct movement toward the unlawful killing of Marla D. Alameda;

(4) That such acts apparently tended to bring about the commission of the offense of premeditated murder; that is, the acts apparently would have resulted in the actual commission of the offense of premeditated murder except for an unexpected intervening circumstance which prevented completion of that offense; and

(5) That at the time the accused committed the acts alleged, he had the premeditated design to kill Marla D. Alameda.

See Paragraphs 4b and 43b(1), Part IV, Manual, supra. He also instructed them on the elements of the following lesser-included offenses: attempted unpremeditated murder, attempted voluntary manslaughter, aggravated assault, and assault consummated by a battery. See Paragraphs 43b(2), 44b(1), 54b(4)(a), and 54b(2), Part IV, Manual, supra, respectively.

At trial, the prosecution's proof of the elements of premeditation and intent to kill consisted of the following:

(1) Mrs. Alameda's testimony that appellant removed an unused garbage bag from his pocket and attempted to place it over her head;

(2) the unopened roll of masking tape, a utility knife in its original package, and an unopened package of latex gloves, found in a common dormitory bathroom;

(3) a box of Hefty garbage bags with one bag removed and appellant's fingerprints on the box; and

(4) TSgt Moody's testimony regarding appellant's silence at the time of his apprehension.

The court below held that the masking tape, utility knife, and latex gloves were not sufficiently connected to appellant to be relevant. The Government has not contested that holding, and we are satisfied that it is not "clearly erroneous," nor would it "'work a manifest injustice' if the parties were bound by it." Accordingly, it is the law of the case. United States v. Doss,

___ MJ (7 n.*) (2002)(citing Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 817 (1988)).

In light of our holding that appellant's silence was not admissible proof of the substantive offense, the only remaining proof of appellant's premeditated attempt to kill was the box of Hefty garbage bags bearing appellant's fingerprints, Mrs. Alameda's testimony that appellant tried to put a Hefty garbage bag over her head, and the abrasions on Mrs. Alameda's neck.

Mrs. Alameda's testimony was not entirely consistent with an attempted premeditated murder. She testified that she became hysterical when appellant came to the house, and that he then sat down on a couch and wanted to talk. Mrs. Alameda testified that he tried to calm her down. She also testified that after she ran into the bedroom and told appellant that she would talk to him, he stopped moving toward her and began walking toward the living room, thereby allowing her to escape through the bedroom window.

Likewise, the only remaining admissible evidence of intent to kill was the same box of Hefty garbage bags bearing appellant's fingerprints, the abrasions on Mrs. Alameda's neck, and her testimony. Her testimony included both a statement that appellant sought to strangle or suffocate her with a garbage bag, as well as a statement that appellant subsequently agreed to return to the living room to talk, at which time she made good her escape.

After considering the admissible evidence of premeditation and intent to kill, we are not satisfied beyond a reasonable doubt that the members would have convicted appellant of attempted premeditated murder, the lesser-included offenses of

attempted unpremeditated murder or attempted voluntary manslaughter, without (1) the testimony about appellant's silence, (2) the masking tape, the latex gloves, and the utility knife, (3) the improper comment of trial counsel on appellant's silence, and (4) the instruction of the military judge that may have exacerbated the impact of trial counsel's argument. Accordingly, we must reverse the lower court's decision with respect to Charge I and its specification, alleging attempted premeditated murder.

The court below concluded that admission of irrelevant evidence (the masking tape, latex gloves, and utility knife) was harmless beyond a reasonable doubt with respect to the charge of attempted premeditated murder. However, that court has not considered whether the cumulative effect of that error, combined with the errors of constitutional magnitude found by this Court, were harmless beyond a reasonable doubt with respect to the lesser-included offenses of aggravated assault or assault consummated by a battery. Accordingly, we conclude that a remand for further review under Article 66(c), UCMJ, 10 USC § 866(c), is appropriate.

## Decision

The decision of the United States Air Force Court of Criminal Appeals is reversed with respect to Charge I and its specification and as to the sentence. In all other respects, the decision below is affirmed. The findings of guilty of Charge I and its specification and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force for remand to the Court of Criminal Appeals. That court

will review the record to determine if the errors were harmless beyond a reasonable doubt with respect to the lesser-included offenses that do not contain elements of premeditation or intent to kill, i.e., aggravated assault and assault consummated by a battery; and whether the remaining evidence is factually and legally sufficient to support a conviction of aggravated assault or assault consummated by a battery. The court may reassess the sentence or order a sentence rehearing. As an alternative to further review of the record with respect to the lesser-included offenses of Charge I and its specification, the court may order a rehearing on the charge of attempted premeditated murder and the sentence. Thereafter, Article 67, UCMJ, 10 USC § 867, will apply.

EFFRON, Judge (concurring in part and dissenting in part):

In the present case, trial counsel elicited testimony concerning appellant's post-apprehension silence, and then asked the court-martial members to view appellant's silence as reflecting consciousness of guilt.  I agree with the majority's determination that trial counsel's comments violated the protections against self-incrimination in the Fifth Amendment, U.S. Const. amend. V, and Mil.R.Evid. 304(h)(3), Manual for Courts-Martial, United States (2000 ed.), and that the comments were prejudicial with respect to the charge of attempted premeditated murder.  I respectfully disagree with the majority's suggestion that this error may have been harmless with respect to lesser included offenses.

In the face of such a constitutional violation, the burden is on the Government to demonstrate that the error was harmless beyond a reasonable doubt.  See ___ MJ at (23) (citing Chapman v. California, 386 U.S. 18, 24 (1967)).  Under Chapman, an appellate court must determine "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."  Chapman, 386 U.S. at 23.

The record of trial demonstrates that the Government has failed to show that the error was harmless beyond a reasonable doubt.  The testimony concerning appellant's silence established

that appellant did not respond when law enforcement officials informed appellant that he was being arrested for an "alleged assault." Trial counsel's subsequent argument that appellant's silence indicated "consciousness of guilt" encouraged the members to infer guilt on the grounds that appellant's silence amounted to a confession that he had attacked his wife on the day in question. Given the powerful nature of such evidence, the Government faces a very high hurdle in terms of demonstrating that the error was harmless beyond a reasonable doubt. In this case, the Government's challenge is made all the more difficult by the military judge's comments. Instead of giving a proper curative instruction, the military judge validated trial counsel's argument by opining that it was a "fair comment on the state of the evidence."

The prejudicial impact of the error is underscored by the fact that trial counsel did not limit his argument concerning "consciousness of guilt" to the element of intent. The improper argument was made while trial counsel was discussing appellant's opportunity to commit the attack on his wife. It was not restricted to a demonstration of intent, but was presented to the members as an admission that appellant attacked his wife on May 19, 1998. Given the breadth of the argument, the prejudicial effect is not limited to the offenses involving

2

intent to kill, but extends to all offenses arising from the alleged attack.

Excluding evidence of appellant's silence and the other evidence determined to be inadmissible by the Court of Criminal Appeals, the only remaining evidence of guilt consisted of the testimony of appellant's wife that he tried to strangle her with a Hefty garbage bag, a box of Hefty garbage bags with appellant's fingerprints, and abrasions on Mrs. Alameda's neck. See ___ MJ at (26). The issue in this case is not whether such evidence would be adequate to establish the legal sufficiency of a conviction, see Jackson v. Virginia, 443 U.S. 307, 319 (1979), but whether there is a reasonable possibility that the error "might have contributed to the conviction." Chapman, 386 U.S. at 23. In the present case, there is a substantial possibility that the members viewed trial counsel's assertion -- that the evidence demonstrated appellant's consciousness of guilt -- as substantially bolstering the credibility of the evidence against him, particularly the critical testimony from his wife. The prejudicial impact was compounded by the comments from the military judge which tended to validate trial counsel's argument. "Under these circumstances, it is completely impossible for us to say that the [Government] has demonstrated, beyond a reasonable doubt, that the [trial counsel's] comments and the trial judge's instruction did not contribute to

[appellant's] conviction."  Id. at 26.  We should set aside the findings with respect to Charge I and authorize a rehearing.

CRAWFORD, Chief Judge (dissenting):

I dissent because: (1) trial defense counsel made no specific objection; (2) there was no Fifth Amendment, U.S. Const. amend. V, violation; (3) there was no Article 31, Uniform Code of Military Justice (UCMJ), 10 USC § 831, violation; and (4) the evidence of appellant's intent to kill is overwhelming, making any error harmless beyond a reasonable doubt.

### FACTS

On May 19, 1998, appellant attempted to kill his wife, Marla Alameda. His acts are corroborated not only by several items of physical evidence, but also by the testimony of numerous witnesses. From 1991 until the date of the attempted murder, appellant abused his wife both physically and mentally. Appellant was a jealous, suspicious, and controlling individual. The physical and mental abuse was such that Mrs. Alameda had previously been medically evacuated from Japan to the United States.

On April 30, 1998, while his wife was asleep, appellant scrutinized his wife's chat room messages that she had saved on her computer. He found a message that implied that a person she chatted with would soon be visiting Japan where they lived. Appellant woke her up and confronted her. He demanded she explain what happened, and became so enraged that he threw the

computer off the desk, ripped the phone off the wall, and then assaulted her, leaving her bruised, shaken, and scared. He told her, "If you screw me, you better put me in jail or I will kill you." Appellant eventually left for work.

Based on moral and physical support from her friends, she reported this assault to appellant's commander. As a result, appellant was ordered out of their on-base quarters and put in a dormitory room. Further, he was given a direct order, both verbally and in writing, not to have any contact with his wife and son. An early return of dependents (ERD) package was initiated. Despite appellant's refusal to sign the required papers, the command processed the action.

On May 19, Mrs. Alameda called appellant's squadron to obtain money for groceries and was told that someone would deliver the money that day. When informed that his wife needed money, appellant refused to give her any cash. He said, "I will go buy her the groceries and I will deliver them to the house myself." Because of the no contact order, two escorts accompanied him when he delivered the groceries to the house. He then inspected each room. Finding condoms in the bedroom, he became very upset. Appellant left the house with the escorts and then told his squadron that he was going to speak with the chaplain.

When his wife returned home from work, she noticed the groceries had been delivered and that various personal items were moved. She was upset and called the unit commander, First Lieutenant (1Lt) Deborah Haussler, who calmed her down and reminded her that the ERD package would be expedited. 1Lt Haussler asked her to come to the unit to sign the ERD paperwork at 3:30 P.M.

Five or ten minutes later, Mrs. Alameda heard the doorbell ring and opened the door. It was appellant. She stood there frozen in terror and panic. Appellant pushed his way into the house and began yelling and screaming. He wrestled her from room to room and tried to suffocate her, first with his hands and then by using a Hefty garbage bag. Before he was able to put the garbage bag over her head, she was able to escape to the bedroom and lock the door. She climbed out of a window, went to a neighbor's house, and called for help. This led to the charge of attempted premeditated murder.

During the opening statement, trial defense counsel admitted that the fight on April 30 occurred, but denied appellant had anything to do with the assault on May 19. In support of this contention, he argued that appellant visited the chaplain's office between 2:00 P.M. and 3:30 P.M. on May 19. The reason appellant visited the chaplain was because he had found condoms in the bedroom of his home when he delivered the groceries.

Appellant also called a friend from the chapel, at 2:09 P.M., during the course of his counseling session.  After visiting the chaplain, appellant went back to the barracks, unloaded his van, and was sitting on the barracks porch when the police arrived at 4:00 P.M.

Appellant's alibi defense was countered by the Government with the testimony of a neighbor, who identified appellant's van near his house around 3:30 P.M.  Another witness, Ms. Melanie Young, the Alamedas' next door neighbor, heard screaming followed by frantic pounding on her front door, as well as pounding on another neighbor's door shortly after 3:00 P.M.  Ms. Young found an hysterical Mrs. Alameda knocking on doors crying "[h]elp me."  Ms. Young saw bruising and redness on various parts of the victim's body, as well as the open window through which the victim escaped from her bedroom.  Mrs. Alameda told Ms. Young that appellant had come home, knocked on the door, and then tried to kill her by choking her.

The Government's theory of the case was that appellant intended to kill his wife without being caught.  Using the chaplain's counseling session as an alibi was a part of appellant's scheme.  Another means utilized by appellant for

avoiding detection was the use of latex gloves to preclude fingerprinting and masking tape to muffle any sounds.[1]

Appellant was charged with attempting to kill his wife. Both before and after his arrest, appellant did not make any statement such as "I could not have done that," "I wasn't there," or ask, "Why are you arresting me?"  During his questioning of Technical Sergeant (TSgt) Moody, a member of the Air Force Security Forces (Security Forces), the assistant trial counsel conducted the following direct examination:

Q. So, after your back-up arrived, what did you do next?

A. After my back-up arrived, I got out of the vehicle and I pretty much approached Airman Alameda.  In route to approaching Airman Alameda, I came by his van and I just kind of rubbed my hand across his van to try and determine whether or not the van had just been operated.  I was unable to tell because the van was hot and it was a hot day out and I was unable to tell whether the motor had just been running because the motor is encased.

And so, I approached Airman Alameda and asked him if he was Airman Alameda, and he said that he was.  The gentleman who was next to him, I asked him if he could just move out of the way. I asked Airman Alameda for an ID card to prove that he was Airman Alameda. He did show me an ID card.

Q. Did he ask any other questions during this time?

A. No.

---

[1] This Court is not bound by the lower court's decision  that the utility knife, masking tape, and latex gloves were not relevant evidence.  See United States v. Walker, ___ MJ ___ (2002) (Sullivan, S.J., joined by Crawford, C.J., dissenting).  Even without this evidence, there is substantial evidence of the premeditated intent to kill.

    Q. Did he say anything, like "What do you want?  What
       are you here for?" or anything like that?

     A. No.

    DC: Objection, Your Honor.  Irrelevant.

    MJ: Overruled.

    [Questions by assistant trial counsel]

     Q.  Did he make any such statement as that?

     A.  No, sir, he did not.

Drawing from this colloquy, appellant states:

    Thus, without question, the prosecutor elicited
    testimony from the arresting officer, a member of
    the Air Force Security Forces, that [appellant]
    remained silent after he was placed under arrest.
    The prosecutor later emphasized that fact in
    argument as an indication of consciousness of
    guilt.

        Although an entirely appropriate objection was
    made, it was overruled and the trial counsel
    continued.

Brief on Behalf of Appellant at 7 (emphasis in original).

However, several key factors undercut appellant's argument.

    All questions and answers transpiring prior to appellant's

relevance objection concerned appellant's silence before he was

placed under arrest.  Clearly, the approaching Security Forces

officer said nothing to solicit a response from appellant other

than to ask for his identification card.  In fact, there is no

evidence in the record of trial that anyone questioned appellant

outside his dormitory that evening.

6

The only matter appellant objected to, based on relevance, was the assistant trial counsel's questions concerning appellant's reaction upon seeing the Security Forces officer. It was only after the last question and answer quoted above that TSgt Moody <u>arguably</u> placed appellant under arrest. The testimony of TSgt Moody on direct examination continued as follows:

> Q. After you verified it was, in fact, Senior Airman Tedio Alameda, what did you do next?
>
> A. I informed him that he was going to be apprehended for an alleged assault.
>
> Q. And what did he say or do then?
>
> A. He didn't say anything. He didn't do anything. He had a look like [witness stared ahead] and that was it.
>
> Q. Did he ask you why he was being arrested?
>
> A. No he did not.

The above questions and answers drew no objection from trial defense counsel. The assistant trial counsel continued his questioning:

> Q. (Counsel). Did he act like he knew what was going on?
>
> DC: Objection, Your Honor. <u>Calls for speculation</u>. (Emphasis added.)
>
> MJ: Again, you can ask him what he observed, but you can't ask him for those types of conclusion of whether or not he did understand.

    Q. So, again, when you asked Airman Alameda for his ID card, did he say anything?

    A. No, sir.

    Q. And when you told him that he was being apprehended, did he say anything?

    A. He said --

    DC: Objection.  <u>Asked and answered, Your Honor.</u> (Emphasis added.)

    MJ: I'll allow it, as long as you move on.

    Q. Yes, Your Honor.


    Q. How would you describe Airman Alameda's reaction after you told him he was being placed under arrest?

    A. Once again, just as in the previous situation where I had made contact with Airman Alameda, he didn't have much of a reaction or much emotion at all.

Trial defense counsel raised two objections.  The first was "speculation."  The military judge essentially sustained that objection by counseling the assistant trial counsel not to ask questions about what appellant's thoughts were.  However, for purposes of the issues he now raises on appeal, appellant's objection was off the mark.  Trial defense counsel did not comment on the judge's ruling because the military judge ruled appropriately on the defense objection.

The second objection, "asked and answered," occurred after the assistant trial counsel asked TSgt Moody if appellant said

anything while he was being arrested.  The military judge responded by telling the assistant trial counsel to move along.  The judge's ruling granted relief to the defense in response to the specifically raised objection.  TSgt Moody responded, appellant "didn't have much of a reaction or much emotion at all."  He did not comment directly on what appellant said or did not say.

In a lengthy closing argument, the Government mentioned that when the Special Forces came, the defendant never asked why they were present.  Additionally, the Government made reference to the items found -- the rubber gloves, the knife and tape -- as evidence of consciousness of guilt and a premeditated intent to murder.

## DISCUSSION

## MIL.R.EVID. 103

Mil.R.Evid. 103(a)(1), Manual for Courts-Martial, United States (2000 ed.), requires a "timely objection ... stating the specific ground of objection, if the specific ground was not apparent from the context...."  "Further, [t]he burden is placed on the party opponent [to make the objection], not the judge."[2]  Where the evidence is otherwise admissible, it is not the judge's role to require a proffer to show that it is admissible.

---

[2] John W. Strong, 1 McCormick On Evidence § 52 at 220 (5th ed. 1999).

Likewise, a general objection that the evidence is irrelevant will not suffice.[3]  Furthermore, the objection only preserves the specific ground named.  Thus, even though there was a good but unnamed objection, that objection will not be considered on appeal.[4]

In this instance, the only objection made to appellant's pre-arrest silence was relevance.  This objection did not preserve any potential objection to the evidence pursuant to the strictures of Article 31, the Fifth Amendment, or Mil.R.Evid. 304(h)(3).  Trial defense counsel's other objections ("speculation" and "asked and answered"), likewise did not preserve the issues now addressed.

CONTRADICTION

During the trial, from the opening statement through trial defense counsel's examination of the witnesses, the defense's

---

[3] United States v. Sandini, 803 F.2d 123, 126-27 (3d Cir. 1986).  See United States v. Adkins, 196 F.3d 1112, 1116 n.3 (10th Cir. 1999)(a nonspecific objection does not preserve a Rule 403 objection); United States v. Wilson, 966 F.2d 243, 245-46 (7th Cir. 1992)(failure to cite Rule 403, or mention the prejudicial effect of the evidence, constitutes waiver); United States v. Mejia, 909 F.2d 242, 246 (7th Cir. 1990)(relevance objection does not preserve Rule 403 or Rule 404(b) objection); United States v. Gomez-Norena, 908 F.2d 497, 500 (9th Cir. 1990)(only making the correct specific objection preserves issue for appeal); Bryant v. Consolidated Rail Corp., 672 F.2d 217, 220 n.4 (1st Cir. 1982)(relevance objection does not preserve ruling under Rule 404).

[4] United States v. Gomez-Norena, supra.  See also United States v. Brewer, 43 MJ 43, 47 n.2 (1995)(failure to make specific objection constitutes waiver absent plain error).

theory of the case was alibi;[5] appellant was with the chaplain and it would have been physically impossible for him to attempt to kill his wife. Appellant's silence at the time of arrest undermines the defense theory. His silence confirms both the direct and circumstantial evidence that he committed the offense.

## FIFTH AMENDMENT and ARTICLE 31

The Fifth Amendment, supra, states: "No person ... shall be compelled in any criminal case to be a witness against himself...." Likewise, Article 31(d) prohibits the admission of statements obtained as a result of coercion or unlawful inducement. Thus, at trial, the prosecution may not use the evidence that appellant stood mute. Miranda v. Arizona, 384 U.S. 436, 468 n.37 (1966).

Setting aside demeanor evidence at the time of arrest, silence has been recognized as evidence of guilt for hundreds of years. "An early exposition of the rule is the maxim of Pope Boniface VIII: "Qui tacet, consentire videtur," or "He who is silent shows agreement." 5 Pope Boniface VIII, Book of Decretals, ch. 12 § 43 (c. 1300). United States v. Cook,

---

[5] See, e.g., Shafer v. South Carolina, 532 U.S. 36 (2001)(prosecutor's closing argument that Shafer and his two accomplices "might come back" opened the door to show future dangerousness and required an instruction of life without parole); United States v. Franklin, 35 MJ 311, 317 (CMA 1992)(trial defense counsel's opening statement opened the door to the issue of intent). See also United States v. Turner, 39 MJ 259, 263 n.2, 266-67 (CMA 1994).

48 MJ 236, 241 n.l (1998)(Crawford, J., dissenting).  Certainly silence is ambiguous.  But many courts have recognized that absent a Miranda warning, silence may be admitted.

The Supreme Court has addressed the issue of pre-arrest silence and post-arrest silence, absent Miranda warnings.  While federal courts are split on the admission of silence as substantive evidence,[6] some have allowed prosecutors to comment on such evidence.  In Jenkins v. Anderson, 447 U.S. 231, 238, 240 (1980), and Fletcher v. Weir, 455 U.S. 603, 607 (1982)(per curiam), the Court held that absent Miranda warnings, pre-arrest or post-arrest silence may be used to impeach a defendant.

In Jenkins, the defendant, who was indicted for murder, claimed that he acted in self-defense.  Jenkins, 447 U.S. at 233.  At trial, the prosecution cross-examined Jenkins about his failure to explain his version of events to the police for at least two weeks.  Id.  The prosecutor also referred to the defendant's previous silence in his closing argument.  Id. at 234.  On appeal the Supreme Court held[7] that the Fifth Amendment, supra, was not violated by the prosecutor's use of the

---

[6] Three circuits have indicated that silence as substantive evidence of guilt is admissible in the prosecution's case-in-chief.  See, e.g., United States v. Oplinger, 150 F.3d 1061 (9th Cir. 1998); United States v. Zanabria, 74 F.3d 590 (5th Cir. 1996); United States v. Rivera, 944 F.2d 1563 (11th Cir. 1991).  Four have concluded otherwise.  See, e.g., Combs v. Coyle, 205 F.3d 269, 283 (6th Cir. 2000); United States v. Burson, 952 F.2d 1196 (10th Cir. 1991); Coppola v. Powell, 878 F.2d 1562 (1st Cir. 1989); United States ex rel. Savory v. Lane, 832 F.2d 1011 (7th Cir. 1987).

[7] Justice Powell wrote the majority opinion.  Justice Stevens concurred in the judgment and Justices Brennan and Marshall dissented.

defendant's pre-arrest silence to impeach his credibility.  Id. at 238.  The Court expressly noted that it did "not consider whether or under what circumstances prearrest silence may be protected by the Fifth Amendment."  Id. at 236 n.2.

Justice Stevens, concurring in the judgment, commented that he "would reject [the defendant's] Fifth Amendment claim because the privilege against compulsory self-incrimination is simply irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak."  Id. at 241 (footnote omitted).  Likewise, Justice Stevens noted that under his approach, "assuming relevance, the evidence could have been used not only for impeachment[,] but also in rebuttal even had petitioner not taken the stand."  Id. at 244 n.7.  In essence, this evidence could be used to rebut Jenkins' self-defense theory.

The Court addressed post-arrest silence in Fletcher v. Weir, supra.  Following Jenkins, it held that post-arrest silence, absent Miranda warnings, may be used to impeach the defendant at trial.  Fletcher, 455 U.S. at 607.  In both cases the Court noted that Miranda warnings, that might have induced silence, were not given.  While the Jenkins and Fletcher decisions permit pre-arrest and post-arrest silence, absent a Miranda warning, to be used for impeachment, they did not address the use of such silence as substantive evidence.  Nonetheless, the Justices'

13

rationale in these opinions, coupled with the Fifth Amendment's history, would permit the Government to use appellant's silence under the facts of this case.

While the federal courts are split on whether to permit use of pre-arrest silence and post-arrest silence as substantive evidence in the absence of rights warnings, the courts have permitted the prosecution to argue inferences arising from an individual's conduct at the time of arrest. In United States v. Thompson, 82 F.3d 849 (9th Cir. 1996), the court permitted the prosecutor to comment on the appellant's silence at the time of his arrest. Id. at 854. During a drug transaction in his house, the appellant killed a man with muffled shots. When the police arrived, the appellant answered some police questions but refused to answer others because he said he was scared and wanted to talk to a lawyer. Id. The detective who interviewed the appellant testified that when he responds to this kind of call he normally asks the people to indicate what happened, and they "are more than eager to tell...." Id.

In Thompson, the prosecutor made the following comment concerning the defendant's refusal to answer police questions before his arrest:

> I am not going to make a big deal out of Mr. Thompson's response when the police come [sic] to the door following this shooting. I'm not going to make a big deal about it at all. But you got to admit, it's a little strange under the

14

> circumstance, have the police come in there, and the first thing they're going to say is, "What happened?" "I want a lawyer." I mean, that's strange. That's not the way people in circumstances that are legitimate are going to react. They would probably be inclined to tell the cop what happened; "This guy broke into my apartment." None of that happened. But then again, this is Mr. Thompson.

Id. at n.7. After noting the split in federal courts on the issue of silence as substantive evidence, the Ninth Circuit held that the prosecutor's comment was not plain error. Id. at 856 (citing United States v. Davenport, 929 F.2d 1169, 1174-75 (7th Cir. 1991)).

In the case before us, TSgt Moody testified that appellant did not say anything like "What do you want?", or "What are you here for?" However, TSgt Moody did describe appellant's demeanor. Asked if he reacted in any way, the witness indicated that appellant "stared [straight] ahead."

When an individual has received rights warnings and told of the right to remain silent, silence becomes an intentional act. It is the exercise of one's right. But the privilege against self-incrimination "protects an accused only from being compelled to testify against himself, or otherwise provide ... evidence of a testimonial or communicative nature...." Schmerber v. California, 384 U.S. 757, 761 (1966). Neither the Fifth Amendment nor Article 31 protects an individual from giving physical evidence such as handwriting, voice exemplars,

or demonstrating one's sobriety. See Pennsylvania v. Muniz, 496 U.S. 582, 591 (1990).

Appellant was not an individual who was relaxed or unemotional. His body language of looking straight ahead, when confronted, was evidence that the court members could consider and could be commented upon by the prosecution. Such evidence is neither testimonial nor communicative in nature. While the judge had the discretion to exclude the evidence, especially after a proper objection, there was absolutely no abuse of discretion in failing to do so.

The trial counsel's comments in this case were a fair response to the trial defense counsel's opening statement and examination of the witnesses. United States v. Shoff, 151 F.3d 889, 893 (8th Cir. 1998). Additionally, in an argument that went more than 30 minutes, trial counsel's statement that appellant made no explanation and stared straight ahead, was only a passing reference not requiring a reversal of the conviction. See, e.g., United States v. Sidwell, 51 MJ 262, 265 (1999).

Certainly, appellant's reaction undercuts the defense's theory throughout the case that appellant had nothing to hide. In fact, appellant recognized the impact of his silence because the next day he told his escorts he was at the chaplain's office at the time of the offense, and wondered why he was being placed

in pretrial confinement.  He could have said that one day earlier, but did not.

## HARMLESS ERROR

The evidence in this case is overwhelming.  The majority recognizes that appellant may very well be guilty of a lesser-included offense, but improperly assumes the lower court's Article 66(c), UCMJ, 10 USC § 866(c), role and makes findings that are equivalent to findings of fact regarding premeditation and appellant's intent to kill.  The evidence admitted at trial of appellant's intent to kill his wife is far greater than the majority opinion indicates.  I am particularly disturbed by the majority's failure to consider appellant placing a Hefty garbage bag over the victim's head and the use of deadly force with a butcher knife to intimidate his wife on a prior occasion.  The majority's view indicates that if a person assaults and wounds a victim on one occasion, because the perpetrator intended to assault and wound that victim, this same perpetrator could not be convicted of attempting to murder the same victim at a later date, even though that was the perpetrator's specific intent.  Even if one were to accept the majority's view that the evidence of premeditation was inadmissible, there is more than sufficient evidence that appellant intended to kill his wife.  The Court of Criminal Appeals should be able to consider unpremeditated murder and manslaughter as lesser-included offenses.

17

CONCLUSION

For all of these reasons, I respectfully dissent.